639 F.2d 1243
 Anthony T. LEE et al., Plaintiffs,
United States of America, Plaintiff-Intervenor Amicus
Curiae-Appellant.
National Education Association, Inc., Plaintiff-Intervenor,
v.
LEE COUNTY BOARD OF EDUCATION, Auburn City Board of
Education, and Opelika City Board of Education et
al., Defendants-Appellees.
 No. 78-3271.
 United States Court of Appeals,
Fifth Circuit.
 March 19, 1981.
 
 Griffin B. Bell, Atty. Gen., Mark Gross, Jessica D. Silver, Attys., James P. Turner, Deputy Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Barry E. Teague, U. S. Atty., Montgomery, Ala., for the United States.
 Stanley A. Martin, Yetta G. Samford, Jr., Opelika, Ala., Robison, Belser, Brewer & Mancuso, Vaughan H. Robison, Montgomery, Ala., for defendants-appellees.
 Robert Meadows, III, Robert M. Harper, Auburn, Ala., for Auburn City Bd. of Ed.
 Charles S. Coody, Dept. of Ed., Montgomery, Ala., for Ala. State Bd. of Ed.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before TUTTLE, RANDALL and TATE, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 The United States brings this appeal from an order of the United States District Court for the Middle District of Alabama denying the government's motion for interdistrict relief to desegregate the Loachapoka School in Lee County, Alabama. The government's motion sought to require all three school boards in Lee County (the Auburn City Board of Education, the Opelika City Board of Education and the Lee County Board of Education) and the State of Alabama Board of Education jointly to develop and implement an interdistrict plan to desegregate the predominantly black school located at Loachapoka in the Lee County district. We agree with the court below that the evidence in this case does not support such interdistrict relief and we affirm the judgment of the district court.
 
 I. LEE COUNTY AND ITS SCHOOLS
 A. Lee County Schools Prior to 1970[1]
 
 2
 Lee County is located in the eastern part of Alabama. Bordered on the east by the State of Georgia and on the west by Macon County, Lee County encompasses the cities of Auburn and Opelika. Opelika lies in the north central part of the county; Auburn is located adjacent to, but slightly south and west, of Opelika. A substantial rural area lies to the southeast of these cities and a smaller rural area is located west of them. A map of Lee County is attached as an appendix to this opinion.
 
 
 3
 There are currently three public school districts in Lee County. The City of Opelika has long operated an independent school system; however, the Opelika City school system has traditionally accepted students residing outside the city as transfer students. Prior to 1962, the Lee County School Board operated schools for the rest of the county, including the City of Auburn. Some children living in areas outside the Auburn city limits were assigned to schools located in the city. This was especially true of children living in the area of Lee County around Loachapoka, located immediately to the west of Auburn, which had only limited school facilities. Two county schools a small elementary school for whites, and a larger elementary and junior high school for blacks served this area. Since neither school provided instruction in the upper grades, it was necessary for students in those grades to attend school outside the Loachapoka area. Schools located in Auburn were much closer than other county schools and had traditionally enrolled students from the Loachapoka area. Some students living outside the city limits in western Lee County also attended schools located in Auburn in the earlier grades. Apparently, most of these students were white.
 
 
 4
 In an attempt to minimize the problems created for the county school district by Auburn's secession from the county district in 1962, the Auburn district and the Lee County district, by agreement dated August 23, 1962, agreed that despite the creation of the separate city district, children residing in the county would be permitted to attend schools in the city "in approximately the same numbers and from generally the same areas as in the preceding year." Under the terms of the agreement, the county board had responsibility for transporting children residing outside the corporate limits of Auburn; the county board also agreed to provide transportation to city schools for city children who lived a substantial distance from school. The agreement provided that the superintendent of the city district had complete authority to assign children from the county to a particular school in the city.
 
 
 5
 The agreement between Lee County and Auburn was terminated effective with the academic year 1968-69. Auburn, however, continued to accept a substantial number of county students on the basis of individual transfer applications.
 
 
 6
 At one time all three of the school districts in Lee County operated dual school systems. A state-wide freedom-of-choice desegregation plan ordered in 1967 did not specifically permit or prohibit interdistrict transfers. It appears that transfers among the school districts in Lee County continued following this order. In developing an interdistrict transfer policy after the termination of the agreement with the County, Auburn provided that all applications from out-of-district students "must be made in strict compliance with any freedom-of-choice plan." In 1968-69, 142 white students and 30 black students from Loachapoka attended schools in Auburn.
 
 
 7
 As of 1970, the Lee County Board of Education operated eight schools. Beulah High School was the only school exhibiting a significant degree of integration in 1970; during that year it enrolled 302 white students and 110 black students in grades 1-12. There were two all-white county schools providing grades 1-12, Beauregard and Smith's Station, and one substantially all-white elementary school, Salem. Four schools in the county were virtually all-black: Smith's Station Elementary School, grades 1-6; Sanford, grades 1-12; Wacoochee, grades 1-12; and Loachapoka Junior High School, grades 1-10.
 
 
 8
 The Loachapoka school served residents of the western area of the county who were geographically isolated from other county schools by Auburn and Opelika. In 1970, the Loachapoka Junior High School occupied two school buildings on different sites; the buildings were close, but not adjacent, to one another. One of these buildings had formerly housed the all-white Loachapoka Elementary School, while the other had housed an all-black school for grades 1-9.[2] It appears that the white elementary school in Loachapoka was never very large, the maximum enrollment being 69 students in 1964-65.
 
 
 9
 The freedom-of-choice plan failed to dismantle the dual school system in Alabama. Alabama school districts, including those in Lee County, were ordered to file new plans, designed by local authorities, to eliminate all vestiges of segregation and establish unitary school systems. All three school districts in Lee County filed plans that were accepted by the court without substantial modification and implemented as of the school year 1970-71.
 
 B. The 1970 Desegregation Orders
 1. The Lee County Plan
 
 10
 The desegregation plan proposed by the Lee County School Board and accepted by the court on February 4, 1970, divided the county into four attendance zones. The Loachapoka attendance zone included the area of the county lying to the west of Auburn and Opelika.[3] The existing school facilities in Loachapoka were to be employed to serve grades 1-9. Students residing in this area were to be transported to Beauregard, located in the southern part of the county, for grades 10-12. Loachapoka was the only county school expected to have a substantial majority of black students following implementation of the plan; its projected enrollment was 614 black students and 351 white students. This projection was apparently based on the assumption that neither black nor white students residing in Loachapoka would continue to attend school in Auburn or Opelika. Although this plan anticipated that students at Loachapoka would continue to attend a predominantly black school in grades 1-9, these students were assured of receiving at least some of their education in a substantially integrated environment by their assignment to Beauregard for high school.[4] The plan, however, expressed the county's intention to expand the school facilities at Loachapoka to provide grades 10-12 so that these students could be spared the burdens of being bussed to Beauregard, a ride as long as 96 miles roundtrip for some students.
 
 
 11
 The Lee County plan, as proposed and approved by the court, contained a Singleton[5] out-of-district transfer provision which stated that the district would grant transfers into or out of the district on a nondiscriminatory basis, except that it would not consent to transfers where the cumulative effect of such transfers would be to reduce desegregation or reinforce the dual school system in either the sending or receiving district.
 
 2. The Auburn and Opelika Plans
 
 12
 The details of Auburn's plan for the desegregation of its schools need not concern us here. Under the plan as submitted and approved by the court, all Auburn schools were projected to have enrollments of approximately 65% white students and 35% black students, closely approaching the black/white ratio for the district as a whole. The important point for our purposes is that the Auburn plan as originally proposed and adopted by the court in its order of April 15, 1970, did not contain a Singleton transfer clause.[6] The plan stated that the city schools would accept out-of-district transfer applications "on a non-discriminatory basis as long as space is available." The plan thus did not obligate Auburn to assess the effect of such transfers either on its own desegregation efforts or on the desegregation of Lee County schools.
 
 
 13
 Like the Auburn plan, the Opelika plan provided that all schools in the district would have approximately 60% white and 40% black student populations. Opelika included a Singleton transfer provision in the desegregation plan it submitted to the court. The plan, with certain modifications which need not concern us here, was approved in January, 1970.
 
 
 14
 The Auburn and Opelika plans have remained substantially unaltered since their approval in 1970. The Lee County desegregation plan has, however, been significantly modified insofar as the Loachapoka school is concerned.
 
 
 15
 C. The 1971 Modifications of the Lee County Desegregation Order
 
 
 16
 Shortly after the court approved the desegregation plan for the Lee County school district, the school district began efforts to modify the provisions of the plan affecting Loachapoka. On four occasions between May, 1970 and January, 1971, the Lee County Board requested the court's approval of a plan to expand the Loachapoka school to provide a high school curriculum. Each time, the government opposed the request because it feared that expansion of the Loachapoka school would decrease the degree of desegregation otherwise achieved under the 1970 plan. The court denied each of these requests.[7]
 
 
 17
 In October, 1971, the county again requested court approval of a plan to expand the Loachapoka school facilities and curriculum to provide high school classes. The government again opposed the request, but agreed that "if any modification of the Lee County plan which authorized construction of high school facilities at Loachapoka, also required all students residing in Loachapoka to attend school there the government would not further oppose the plan." Based on 1970-71 attendance figures, the high school grades at Loachapoka were expected to enroll 130 black students and 75 white students, and would thus be 63% black. During the school year 1970-71, grades 10-12 at Beauregard were 68% black and 32% white. Thus, the high school at Loachapoka was expected to have a ratio of blacks to whites very similar to that at Beauregard. The total enrollment at Loachapoka was expected to be 964, with 75% of the total enrollment consisting of black students. Given these figures, the government concluded that "such a modification would not diminish the degree of desegregation achieved under the plan approved in 1970 and would, in fact, eliminate the dual overlapping attendance zones which currently exist."
 
 
 18
 In November, 1971, the court held a hearing on the county's motion to amend its desegregation plan. The Auburn School Board participated in this hearing. At the hearing the parties stipulated that approximately 205 whites and 51 blacks from the Loachapoka area were attending Auburn schools during the academic year 1971-72, and that if all students then residing in Loachapoka and attending public schools attended the Loachapoka school, there would be 247 white students and 725 black students at Loachapoka, which would mean that approximately 75% of the students at Loachapoka would be black.
 
 
 19
 Following this hearing, the district court entered an order approving the construction of high school facilities at Loachapoka and implementing a two-year plan for terminating all attendance at Auburn schools by students residing in the Loachapoka zone. This gradual termination was designed to allow students enrolled in junior high or high school to complete their academic programs at Auburn schools. The court ordered that these provisions limiting and ultimately eliminating transfers from the Loachapoka area into Auburn were to be entered on the record of the Auburn desegregation case as well as the Lee County case. The court did not, however, order a Singleton transfer proviso added to the Auburn desegregation plan. Lee County thereafter expanded the school facilities at Loachapoka and began offering a high school curriculum at this school.
 
 
 20
 D. Post-1971 Events: Transfers and Annexations
 
 
 21
 Although the 1971 order resulted in the termination of transfers from Loachapoka to Auburn as of the academic year 1973-74, transfers into Opelika schools continued until the 1978-79 year. These transfer students were either students attending Opelika schools at the time of the 1970 order, siblings of students who had previously attended Opelika schools, or students who had begun attendance at Opelika schools as residents of Opelika but subsequently moved out of the city. As of the 1977-78 academic year, Opelika enrolled approximately 175 students who were residents of Lee County. Of these, 54 were from the area of Lee County zoned for attendance at Loachapoka; 37 of this group were white and 17 were black.
 
 
 22
 During the spring and summer of 1972, the Auburn City Council approved thirteen petitions requesting annexation that were submitted by persons owning property contiguous to the Auburn city limits. Eleven of these cases areas were located in the area of Lee County zoned for attendance at Loachapoka. There were 375 white property owners and 251 black property owners from the Loachapoka school zone who petitioned for annexation during this period. The record in this case does not contain extensive information about the number or race of school children living in these areas at the time of these annexations. However, the record does contain evidence to suggest that there were few children residing in these areas at that time. In 1978, there were 156 white children and 71 black children living in the areas annexed from the Loachapoka zone. Almost two-thirds of these white children, 109, lived in two subdivisions that were sparsely populated at the time they were annexed to the city. Only 12 white children lived in these two subdivisions at the time of the annexations.
 
 
 23
 E. Current State of Progress under the 1970 Desegregation Orders
 
 
 24
 In the years following the desegregation litigation of the 1960's and early 1970's, the school districts of Lee County have been exceptionally successful in dismantling their dual school systems. As of 1977-78, Auburn's schools ranged from 32% to 41% black in a district having an overall student population that was 36% black. During the same academic year, Opelika's seven schools ranged from 30% to 48% black in a district having an overall population that was 40% black. The total enrollment and racial composition of these school districts appears to have remained relatively stable during the years following 1970, indicating that these communities have continued to support public education during the desegregation process.
 
 
 25
 As of 1977-78, Lee County schools had a total enrollment of 4,853 students; 61.9% of these students were white, and 38.1% were black. Black enrollment in the individual schools in Lee County, with the exception of Loachapoka, ranged from 24% to 35%. In 1977-78, Loachapoka, by contrast, had only 23 white students in a total enrollment of 643 students; it was thus 3% white and 97% black. Loachapoka has remained virtually an all-black school during the period since 1970 in which every other school in the county district, as well as in the cities, has been effectively desegregated.
 
 
 26
 II. THE GOVERNMENT'S REQUEST FOR INTERDISTRICT RELIEF AND THE DISTRICT COURT'S RESPONSE
 
 
 27
 The continued existence of a one-race school in a district and state which formerly operated a de jure dual school system is, of course, highly suspect. In 1977, when it became apparent that the existing Lee County desegregation plan was ineffective to desegregate the Loachapoka school, the United States, as plaintiff-intervenor in all three desegregation actions involving the school districts of Lee County, filed a motion seeking to consolidate the desegregation proceedings involving the Lee County, Auburn and Opelika school districts and requesting an order requiring that these three districts jointly develop and implement an interdistrict plan to desegregate the predominantly black Loachapoka school. In support of this motion, the government charged that all three school districts had committed intentionally discriminatory acts which had the effect of creating and maintaining a segregated school at Loachapoka. The government charged that in the years before 1962, during which the Lee County Board operated a dual school system that encompassed the entire county (with the exception of Opelika), the Lee County Board had engaged in a number of acts and omissions that had the purpose and effect of segregating black students in a black school in the Loachapoka area of the county and segregating white students in white schools located in the City of Auburn. The government further alleged that following establishment of an independent Auburn school district in 1962, the Lee County district and the new Auburn district made a formal agreement under the terms of which they continued to assign students from the western area of the county in the same manner as before, thereby perpetuating the segregation of blacks at Loachapoka.
 
 
 28
 The government's motion also alleged that after 1970, when the desegregation orders were entered for all three of the school districts in Lee County, all of the districts continued to take actions having the purpose and effect of maintaining segregation at Loachapoka. The government claimed that the school districts continued to permit transfers from county schools to Auburn and Opelika schools, and that after transfers from county to Auburn schools were expressly prohibited in 1971, Auburn annexed areas of Lee County adjacent to the city which formerly had been part of the Loachapoka attendance zone. These annexations, the government alleged, were intended to perpetuate the segregation of blacks at Loachapoka and effectively did so by removing substantial numbers of white students from the Loachapoka attendance zone.
 
 
 29
 At the hearing on the merits, the district court refused to admit evidence concerning the allegations of unconstitutional conduct occurring prior to 1970 and considered only the merits of the charges based on post-1970 discriminatory conduct. The court found that following 1970, Opelika had continued to accept transfer students from the Loachapoka area and, in so doing, Opelika had violated the provisions of its 1970 desegregation plan by contributing to the diminution of white students at Loachapoka. However, the court concluded that the effect of Opelika's action on the conditions at Loachapoka was de minimis and that Opelika had, as of the time of the hearing on the motion, brought itself into full compliance with the provisions of its desegregation plan restricting transfers, and remedied any effects of these earlier actions, by adopting a policy of accepting no transfer students. Consequently, the court concluded that an order requiring Opelika to undertake further remedial action to desegregate the Loachapoka school was unwarranted. With regard to Auburn, the district court concluded that the Auburn School Board had not knowingly permitted out-of-district students to attend Auburn schools since the 1971 court order prohibiting such transfers. The district court further concluded that the annexations by Auburn could not support an interdistrict remedial order because there was insufficient evidence to establish that these annexations were undertaken with a racially discriminatory motive.
 
 
 30
 The district court found that today Loachapoka is a predominantly black school, not because of any past segregative practices, but because the population in the Loachapoka area of Lee County is predominantly black. The district court did not find that this pattern of residential segregation was caused by any unconstitutional racially discriminatory acts.
 
 
 31
 On appeal, the government argues that the district court erred in the legal analysis it employed in reaching these conclusions. Specifically, the government contends that in the period prior to 1970, the Auburn, Opelika and Lee County school districts jointly operated one dual school system in the western part of Lee County and that in this dual system, the Loachapoka school was the school for black residents of western Lee County and city schools served white residents of the area. The government argues that since these districts effectively operated as one school system for purposes of segregating the Loachapoka school in the period prior to 1970, all of them incurred an obligation to desegregate that school, and that their actions since 1970 should be evaluated solely by their effect on efforts to desegregate the Loachapoka school. According to the government, intent is thus irrelevant to an examination of events occurring since 1970, and the effect of these actions on the Loachapoka school is sufficient to justify an interdistrict remedial order.
 
 III. THE MERITS OF THE APPEAL
 A. A Preliminary Matter
 
 32
 The government's principal contention on appeal is that the district court erred in finding that the Auburn and Opelika school boards had not contributed to the establishment and maintenance of a predominantly black school at Loachapoka and in refusing to enter an interdistrict remedial order. The government also argues that the district court erred in excluding evidence of pre-1970 conduct from consideration in determining the propriety of interdistrict relief. We agree that exclusion of such evidence was error. This evidence was not necessary to establish the earlier existence of dual school systems within the several school districts of Lee County, i. e., intra district constitutional violations, since the school districts had admitted this fact; but such evidence was relevant to the determination of whether these school districts had, during the period prior to 1970 in which they independently operated dual school systems, also engaged in intentional conduct that had segregative effects beyond the boundaries of their respective districts, i. e., whether they had committed any inter district violations. Specifically, such evidence was relevant to the question whether the well-established policy and practice of cross-district enrollment in the county was intended to, and did, have the effect of creating and of maintaining into the late 1970's a segregated school at Loachapoka. Although the 1970 orders and the school districts' admissions conclusively established that these districts had engaged in systemwide, intradistrict constitutional violations prior to that date, nothing in the earlier orders of the court expressed a judicial determination that any of these districts had intentionally engaged in conduct having segregative effects beyond its own borders and none of the school districts ever admitted any such conduct. Evidence relating to these issues was thus clearly relevant to the determination of the merits of the government's request for an order mandating an interdistrict plan for the desegregation of the Loachapoka school. The district court's prohibition of discovery on these matters was also error since the pre-1970 policies and conduct were clearly relevant to the "subject matter involved in the pending action," as required by Fed.R.Civ.P. 26.
 
 
 33
 Despite this claim of error, the government does not urge that the exclusion of evidence regarding pre-1970 policies and conduct by the three defendant school boards was fatal to its case, nor does the government request that we remand the case in order that it may conduct further discovery and introduce evidence regarding pre-1970 activities of the defendants. Rather, the government seems to take the position that the district court's limitations on discovery and exclusions of evidence were essentially harmless error.[8] The government apparently contends that it adduced sufficient evidence of post-1970 conduct by the defendants, which was intended to and did contribute to the maintenance of a segregated school at Loachapoka, to mandate an order for an interdistrict remedy and, alternatively, that even if the government's post-1970 evidence standing alone is insufficient to support an interdistrict remedy, the record of earlier proceedings in these continuing cases contains sufficient evidence regarding the pre-1970 conduct of the defendant boards to support an order requiring all of the defendants to participate in a remedy for the current condition of segregation at Loachapoka.
 
 
 34
 We do not think that the district court's erroneous limitations on discovery and exclusions of evidence regarding pre-1970 activities of the defendants require that we remand this case for further discovery or taking of evidence. The extended description of the pre-1970 policies and conduct of the defendant school boards set forth above is taken from the record in this case and demonstrates the extensive amount of information relating to the period prior to 1970 that was available to the court. Further, as our discussion infra of the law governing interdistrict remedies indicates, events occurring prior to 1970 will support an interdistrict remedial order only if it is shown that these actions have had a continuing, significant segregative effect on the Loachapoka school. Because of the nature of our inquiry, then, we are able to and do accept the government's characterization of the pre-1970 facts.[9] Thus, the government was in no way prejudiced by the district court's ruling; the error was harmless.
 
 
 35
 B. Interdistrict Remedies for Segregated Schools: The Governing Law
 
 
 36
 Any examination of the propriety of an order granting or denying an interdistrict remedy in a school desegregation case must begin with Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In Milliken, the Supreme Court considered a ruling by the Court of Appeals for the Sixth Circuit that affirmed a district court order mandating a metropolitan area plan involving fifty-four school districts to remedy the unconstitutional segregation found to exist in the City of Detroit school district. The district court and the court of appeals held that interdistrict relief was appropriate for two reasons. First, the courts reasoned that although there was no evidence or finding of de jure segregation in any of the school districts except the Detroit system, the State of Michigan, through the actions of the state legislature and state board of education, had contributed to the racial segregation in the Detroit schools; therefore, the suburban school districts, as agents of the state, could be ordered to assist in the desegregation of the Detroit schools as part of the remedial obligation imposed on the state. Second, the lower courts concluded that a metropolitan, multidistrict plan was appropriate, indeed required, because no intradistrict plan could effectively desegregate the Detroit schools and thus an interdistrict plan offered the only real promise of establishing racially integrated schools within the predominantly black city school district.
 
 
 37
 The Supreme Court disagreed. The Court reasoned that the propriety of an interdistrict remedy was fundamentally determined by the principle articulated in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), that the "nature of the violation determines the scope of the remedy." Id. at 16, 91 S.Ct. at 1276. School desegregation remedies, the Court reminded us in Milliken, are designed "as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." 418 U.S. at 746, 94 S.Ct. at 3128. Elaborating upon the predicate required for an interdistrict remedial order, the Court stated:
 
 
 38
 Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.
 
 
 39
 418 U.S. at 744-45, 94 S.Ct. at 3127.
 
 
 40
 Applying these standards to the facts in Milliken, the Court found that the evidence adduced below indicated only that de jure segregation existed within the Detroit school system and that this condition was the result of actions taken by the Detroit Board of Education and state officials. The Court found no evidence to suggest that the suburban school districts themselves had independently contributed to the creation of a segregated school system in Detroit, either by the manner in which district lines were drawn or by accepting white, but not black, city students in suburban schools.
 
 
 41
 The Court rejected the lower courts' reasoning that the involvement by state officials in creating the segregated schools inside Detroit warranted the imposition of remedial obligations on the suburban districts as agents of the state. In so doing, the Court emphasized that school districts, under Michigan law, retained a large measure of local autonomy and that to abrogate that autonomy on the basis of action by the state would be an unjustifiable transgression on a valuable tradition of local control of schools and would create significant problems of management and administration with which a federal court was ill-equipped to deal. The Court concluded in Milliken that the suburban school districts could not be required to participate in desegregating schools in the city district merely on the basis of unconstitutional conduct by the state which had resulted in segregation only in the city district, since the school districts were autonomous entities and not the agents or instrumentalities through which the state effected the racial segregation of the city system.
 
 
 42
 Milliken also refused to accept the other premise upon which the lower courts had approved interdistrict relief. The argument that interdistrict relief was either required or permissible merely because a desegregation plan involving only the Detroit system would not alter the predominantly black character of the district or of individual schools therein was rejected by the Court. In so doing, the Court was reiterating a general principle found in Swann and applying it to the distinctive questions presented by an interdistrict remedy. Swann made clear that the mere existence of a predominantly one-race school did not violate the fourteenth amendment. Milliken made clear that the mere existence of a one-race school district did not violate the Constitution. Like any constitutional violation, a claim of unconstitutional racial segregation in public schools requires a finding that some governmental action caused the segregation. Although Swann established a causal presumption that the continued existence of one-race schools within a school district that formerly operated a dual school system was the result of either past or present discriminatory conduct by the school officials, Swann in no way diminished the vitality or significance of the basic state action requirement. In Milliken, the Court, although recognizing that governmental action was a causal factor in segregating schools within the city school system, found no substantial evidence to believe that the predominantly black character of the Detroit system as a whole was either the product of segregative actions involving other school districts or the result of a larger pattern of segregation in which district lines were drawn according to race.
 
 
 43
 It seems important to note also that Milliken, unlike Swann and Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), did not sanction the use of any presumptions on the question of the cause of interdistrict segregation. Thus, while Swann, as noted above, permits an inference that the continued existence of one-race schools in a system that formerly practiced de jure segregation is a vestige of such segregation, and Keyes permits one to infer the existence of systemwide de jure segregation from proof that school authorities have pursued an intentional policy of segregation in a substantial portion of a school district, Milliken refused to sanction a presumption that significant disparities in the racial composition of autonomous school districts resulted from impermissible action by those districts and thus justified imposing upon them the burden of remedying conditions of segregation existing in other districts. The Milliken Court noted that both Keyes and Swann merely involved "the use of a significant racial imbalance in schools within an autonomous school district as a signal which operates to shift the burden of proof (which) is a very different matter from equating racial imbalance with a constitutional violation calling for a remedy." 418 U.S. at 741 n.19, 94 S.Ct. at 3125 n.19.
 
 
 44
 The government acknowledges that Milliken articulates the law governing interdistrict school desegregation remedies. However, the government's brief relies heavily on law and language drawn from cases involving intradistrict, rather than interdistrict, segregation, in arguing that we should presume, and thus that the government need not prove, a causal nexus between the past pattern of interdistrict transfers in Lee County and the contemporary existence of a predominantly black school at Loachapoka. The government argues that since the principal school at Loachapoka was an all-black school during the era when all three school districts in Lee County maintained dual school systems, and remains predominantly black today, the all-black character of the school is "presumed to be tied to the previous history of systemwide, state-imposed segregation under Dandrige v. Jefferson Parish School Board, 409 U.S. 978, 93 S.Ct. 306, 34 L.Ed.2d 240 (1972); and Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971)." The government contends that this causal presumption places on the defendant school districts the burden in this case of establishing that the continuing racial identifiability of Loachapoka is not the result of "the original systemwide violation."
 
 
 45
 We could, perhaps, agree with much of what the government contends in this respect if the question before us was the propriety of an order requiring the Lee County Board of Education to undertake further efforts to desegregate the Loachapoka school. But the government's motion involved in this appeal requests an order directing not only Lee County, but also the Auburn and Opelika school districts, to take action to desegregate the Loachapoka school. The government is requesting an interdistrict remedy. Given this request, we can only understand the government's reliance on the causal presumptions employed in intradistrict cases to argue, implicitly, that the Lee County, Auburn and Opelika school districts were, in the period prior to 1970, effectively one school system, at least insofar as the western area of Lee County, including Loachapoka, was concerned; and consequently, that the law governing Auburn's and Opelika's continuing liability and remedial responsibility for the existence of a predominantly black school at Loachapoka is properly drawn from the cases involving systemwide, intradistrict segregation, rather than from Milliken. In other words, we understand the government to be arguing that Milliken's requirements of a clearly established causal link between a constitutional violation and a significant, interdistrict segregative effect are inapplicable here because although there were technically three independent school districts in Lee County, there was really only one dual school system in which Loachapoka served as a school for black residents of western Lee County while whites were assigned to the city schools.
 
 
 46
 We do not think it possible or proper to circumvent Milliken's requirements in this manner. Milliken explicitly teaches that school district lines are not to be "casually ignored" or considered as "no more than arbitrary lines on a map drawn for 'political convenience.' " 418 U.S. at 741, 94 S.Ct. at 3125. The politically, financially and administratively autonomous public school district is the instrument through which the valuable tradition of local control of public education is preserved. An interdistrict school desegregation remedy impinges significantly upon the autonomy of the school districts involved. Interdistrict remedies, as the Court noted in Milliken, raise difficult questions about the status and authority of popularly elected local school district officials, the manner in which tax rates are determined and tax revenues allocated among the districts, the validity of long-term financial obligations of the various school districts and the locus of authority in matters regarding curriculum, faculty hiring and assignment.
 
 
 47
 Of course, as the Court noted in Milliken, the cost in terms of traditional autonomy that an interdistrict remedy imposes on local school districts, may be justified, even required, when there is proof of unconstitutional governmental action that has been a "substantial cause" of a "significant" interdistrict segregative effect, and where an interdistrict desegregation plan is necessary in order to remedy segregation "directly" caused by this constitutionally impermissible conduct. The Court's two holdings in Milliken that a federal court cannot impose liability on individual independent school districts on the basis of a general inverse respondeat superior theory holding them presumptively responsible for actions of the state or another governmental entity, and that one cannot presume that racial imbalances between separate school districts result from unconstitutional discriminatory acts on the part of those school districts illustrate that the Court believed that the heavy costs which an interdistrict desegregation remedy would impose on the school districts involved, in terms of financial, administrative and political autonomy, could not be justified on the basis of a theory of vicarious liability or presumptions based upon proof of some other discriminatory conduct. Such costs were justifiable only where there was evidence of a significant interdistrict violation having a substantial interdistrict segregative effect. We believe the Court's deliberate choice of phrases such as "substantial" or "direct cause" and "significant segregative effect" also expresses an insistence that in cases where an interdistrict remedy is requested, there must be clear proof of cause and effect and a careful delineation of the extent of the effect. In the absence of such a showing, school district lines are to be carefully observed and desegregation remedies confined to orders affecting the school district in which the condition of segregation is manifest.
 
 
 48
 We are urged to avoid Milliken's requirement that an interdistrict violation and an interdistrict effect be established by concluding that these three school districts were, in actuality, one, and that we might therefore employ presumptions drawn from Swann and Keyes in order to establish a causal nexus between the past interdistrict transfers and current segregation at Loachapoka. We decline such an approach because we believe that this type of analysis would exhibit precisely the kind of disregard for the integrity of school district boundaries that the Court proscribed in Milliken.
 
 
 49
 The record in this case reveals clearly that in all the areas which the Milliken Court emphasized as being essential to the autonomy of a school district political authority, school finance, curriculum and school administration the Auburn, Opelika and Lee County school districts have been genuinely independent of one another for some time. The districts have, and long have had, separate school boards, different tax rates and different curricula; they do not share faculty or school facilities. In short, they are and long have been bona fide, independent school districts.
 
 
 50
 Cooperation between two or more autonomous school districts does not negate their independent identities. This is not to say, of course, that if such collaboration is intended to and does contribute to racial segregation in any of the school districts involved, it might not support an interdistrict remedial order, but only to make clear that the question whether a number of independent school districts shall be required to assist in remedying a condition of segregation existing in another district is to be evaluated by the standards of substantial direct cause and significant interdistrict segregative effect enunciated in Milliken and not by use of the presumptions applied in intradistrict cases.
 
 
 51
 C. The Propriety vel non of an Interdistrict Remedy in this Case
 
 
 52
 With Milliken now firmly established as our beacon, we turn to examine the government's argument that the record in this case meets Milliken's requirement that an interdistrict remedy be imposed only upon proof of constitutional violations which have been clearly established to be a substantial cause of interdistrict segregation. In order to clarify our discussion, we examine first the question whether the pre-1970 history of interdistrict transfers among the Auburn, Opelika and Lee County school systems now warrants an interdistrict remedial order. We then consider two other arguments asserted in support of the government's request for an interdistrict remedy: first, the contention that Opelika's continued acceptance of transfers after 1970 violated the terms of its desegregation order and contributed to the current condition of segregation at Loachapoka; and second, the argument that Auburn's annexations of Lee County territory which otherwise would be included in the Loachapoka attendance zone either comprised a distinct, interdistrict violation sufficient to support an interdistrict remedial order or perpetuated the effects of the earlier violations.
 
 1. The Pre-1970 Interdistrict Transfers
 
 53
 The government contends that cases applying Milliken's standards have interpreted that case to require interdistrict relief in situations involving interdistrict transfers similar to those which occurred in this case. The government specifically refers us to Newburg Area Council v. Board of Education of Jefferson County, 510 F.2d 1358 (6th Cir. 1974), cert. denied, 429 U.S. 1074, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1977), and Evans v. Buchanan, 393 F.Supp. 428 (D.Del.), aff'd, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). In our opinion these cases, rather than supporting the government's argument that interdistrict relief is appropriate here, suggest instead that such relief is not appropriate in this case.
 
 
 54
 Newburg involved the urban and increasingly black school district of Louisville, Kentucky and the predominantly white Jefferson County district that encompassed the area surrounding the city. The Court of Appeals for the Sixth Circuit approved an interdistrict remedy in that case because district lines had, in the past, been ignored for the purpose of segregating schools, and because the segregative effects of these past actions continued to be reflected in the contemporary racial characteristics of the schools and school districts involved. Specifically, the court found that, in pre-Brown days, black county students were bussed into the city to attend high school because the county had no black high school. However, the court noted that this extinct practice, standing alone, might under Milliken be insufficient to invoke the exercise of the interdistrict remedial powers of the court.
 
 
 55
 In Newburg there were other impermissible practices, continuing at the time of the court's opinion, in which district lines were ignored. For example, as of the date of the court's opinion, the predominantly black city school district owned and operated a predominantly white school located outside the city within the territorial jurisdiction of the county district. Students from both school districts attended this school.
 
 
 56
 In addition to finding that certain present, as well as past, practices of these school districts disregarded district boundaries in order to maintain racial segregation in the schools, the Newburg court also concluded that the boundary lines of these school districts reflected impermissible racial considerations and contributed to the perpetuation of segregation. The boundaries of the Louisville school district were not coterminous with the city limits; consequently there were a substantial number of students, most of whom were white, who lived within the city limits, but outside the boundaries of the Louisville school district, and attended predominantly white county schools, thereby perpetuating the racial disparity between the two districts. Thus, the interdistrict remedy imposed in Newburg did not rest solely, if at all, upon abandoned policies of interdistrict student transfers but upon continuing practices that evidenced a disregard for school district lines in order to perpetuate segregation, as well as on evidence that school district boundaries had been artificially maintained in order to preserve the racial characteristics of the school districts involved.
 
 
 57
 Evans v. Buchanan, supra, involved the predominantly black Wilmington school district and numerous predominantly white suburban school districts in New Castle County, Delaware. Although these school districts had long been financially, politically and administratively independent, the court found that historically there had been substantial interdependence of the Wilmington and suburban school districts in the use of facilities and in pupil assignment. Specifically, the court found that during the period in which all of the school districts involved operated dual systems, there was only one black high school, which served black students from all of the county school districts; that school was located in Wilmington. The court also found that although there were some black elementary schools in suburban districts, "the number of black children crossing district lines into Wilmington indicates that to a significant extent, black schools in Wilmington under the de jure system were schools for black children from throughout New Castle County." 393 F.Supp. at 433. After Brown, these black children attended county rather than city schools; however, the Wilmington schools that had previously enrolled significant numbers of black county children remained predominantly black schools.
 
 
 58
 The court found that, historically, white county students also crossed district lines to attend city schools, either because their school districts lacked a full twelve grade program or because the city schools were considered superior. These practices had, however, long ceased to be common because of the growth of the suburban school districts, and the court found that this historic pattern of interdistrict student transfers had no significant residual effect on the racial composition of the school districts involved. Thus, although the common practice of interdistrict school transfers might well have supported an interdistrict remedy for school segregation maintained through the use of such transfers, the court considered that the practice could no longer be deemed a proximate cause of the contemporary disparity in the racial composition of the school districts and thus could not, by itself, support an interdistrict remedy.
 
 
 59
 As in Newburg, the court's decision in Evans that interdistrict relief was appropriate rested not on the past pattern of interdistrict student transfers but rather on more recent events. The court found that in the preceding two decades official action by several governmental actors, including the Federal Housing Administration, the Delaware Real Estate Commission, the Wilmington and New Castle County Housing Authorities and the Wilmington School Board, contributed to the pattern of residential segregation that resulted in an increasing concentration of blacks within the City of Wilmington and its school district and dispersal of whites to suburban county areas. The court concluded that since numerous governmental authorities had "contributed to the racial isolation of city from suburbs, the racial characteristics of city and suburban schools were still interrelated," as a result of unconstitutional governmental action even though this situation could no longer be deemed a result of the earlier improper action by the school districts. 393 F.Supp. at 438.
 
 
 60
 The court also found that Delaware's Educational Advancement Act was unconstitutional and had contributed to the continued racial disparities among the populations of the New Castle County school districts. The act empowered the Delaware State Board of Education to consolidate school districts without their consent but prohibited consolidation of any district with the predominantly black Wilmington city district. The court found that this legislation had the effect of freezing school district boundaries in New Castle County along racial lines and thus constituted an interdistrict violation warranting interdistrict relief under Milliken.
 
 
 61
 Armour v. Nix, No. 16708 (N.D.Ga.1979), aff'd, 446 U.S. 931, 100 S.Ct. 2146, 64 L.Ed.2d 784 (1980), a more recent, interdistrict desegregation case, suggests that a past practice of interdistrict student transfers, standing alone, without evidence to show that the segregative effects of the practice were carried forward in time by residential patterns which reflected the segregative impact of the transfers, or other government action, which perpetuated the segregative effect of the transfer policies, is insufficient to support an interdistrict desegregation remedy. Armour involved the City of Atlanta school district and a number of suburban county districts in the metropolitan Atlanta area. The demographic pattern was a familiar one. The City of Atlanta, and its school system, has become smaller and predominantly black, as the surrounding suburban communities have expanded rapidly and become predominantly white. Given these residential patterns, no intradistrict desegregation plan promised any degree of meaningful racial integration of the public schools within the city district.[10] In Armour, the court concluded that interdistrict relief would, nevertheless, be inappropriate because the current pattern of pervasive residential segregation, which the court found to be the proximate cause of the racial disparities in the population of the various districts, was not the direct result of any official action on the part of school authorities or any other governmental agent.
 
 
 62
 The court in Armour, like the court in Evans, found that under the dual school system which had previously operated in Georgia, interdistrict transfer policies were frequently used to maintain segregation in the schools. In the past, school districts used transfer programs to alleviate the financial burdens created by the maintenance of separate schools.[11] School districts lacking funds to support complete educational facilities for both races would contract with neighboring districts to provide schooling for one of the races. The court found, however, that these transfer practices had no current effect on public education in the Atlanta metropolitan area and, thus, concluded that these policies could not be used to justify imposition of an interdistrict school desegregation remedy. However, in Armour, unlike Evans, the court was unpersuaded by the housing evidence adduced in support of an interdistrict remedy. Despite evidence of a long history of governmental action intended to prevent racial integration of neighborhoods in the City of Atlanta and its metropolitan area, the Armour court concluded that "(g)overnmental discrimination is not presently a cause of segregated housing patterns."
 
 
 63
 All of the school districts involved in Newburg, Evans and Armour had once operated dual school systems, as did the school districts in Lee County. In all of these cases the courts also found that during the period of de jure segregation in the school districts, interdistrict transfers were used to maintain racial segregation in the schools within each district. Interdistrict transfers allowed some districts to maintain racially segregated schools without actually operating separate facilities for blacks and whites. In Newburg, Evans and Armour, the suburban school districts, rather than constructing and operating separate school facilities for blacks, sent their black students into nearby cities which operated black schools. Before 1970, the situation in Lee County was inverse, but analogous. Lee County operated only a small elementary school for whites in the western area of the county and the majority of whites attended schools in the cities.
 
 
 64
 Newburg, Armour and Evans make clear, however, that the fact that an interdistrict transfer program was formerly used in order to maintain racial segregation in districts operating dual school systems does not support an interdistrict remedial order unless it is established that these transfer programs have a substantial, direct and current segregative effect. In the absence of such a showing of current segregative effect, we understand Newburg, Evans and Armour to indicate that no interdistrict remedy is appropriately ordered upon the basis of earlier interdistrict transfer programs.
 
 
 65
 The government suggests that in this case these past transfer practices have a continuing and contemporary effect because they contributed "to the development of housing patterns which may have encouraged whites to live in or near the city systems and away from the Loachapoka area." This assertion is vague and speculative. The record contains no demographic evidence suggesting that the transfer policies influenced housing patterns in Lee County.
 
 
 66
 The only demographic evidence in the record is the data concerning the overall racial composition of the school districts and the school population census data from the early 1970's. This evidence suggests that the population in the area of Lee County extending westward from the cities and including Loachapoka is predominantly black and that the western area of Lee County has a proportionately larger black population than the rest of the county and the cities. But the causes of this demographic pattern are impossible to determine from the record before us. The government seems to be suggesting that since Lee County, in the days of its dual school system, did not provide educational facilities for whites in the western area of the county, whites were discouraged from living in the area. Although this is not an implausible theory, it appears to us equally plausible that the transfer system, which allowed whites in the western Lee County area to attend city schools, apparently perceived to be academically stronger than those in the county, might have encouraged whites to live there rather than elsewhere in the county where attendance at county schools could not so easily have been avoided.[12]
 
 
 67
 The possible causes of residential segregation are myriad. In the absence of some more compelling logic or more convincing evidence to support the conclusion that current demographic patterns in western Lee County are directly caused by the practice of interdistrict student transfers employed prior to 1970, we cannot conclude that such transfers support an interdistrict desegregation order under Milliken.
 
 2. Post-1970 Conduct of Opelika and Auburn
 
 68
 Although we have concluded that the pattern of interdistrict transfers occurring in the period prior to 1970 will not now, standing alone, support an interdistrict remedial order, there remains the question whether actions occurring since 1970 will provide support for such a decree, either because such actions, in and of themselves, constituted interdistrict violations, or because such actions served to perpetuate the segregative effect of the earlier transfers. Two issues require our attention in order to answer this question. We shall consider first, whether Opelika's continued acceptance of transfer students in the years between 1970 and 1978 supports an order requiring Opelika to participate in efforts to desegregate the Loachapoka school. Then we shall determine whether Auburn's annexations of Lee County areas contiguous to the city's southern and western boundaries justifies an order requiring Auburn to participate in efforts to desegregate the Loachapoka school.
 
 
 69
 In the years between 1970 and 1978, Opelika continued to accept transfer students from the Lee County district. As of the academic year 1977-78, 54 Loachapoka zone students, 37 whites and 17 blacks, attended Opelika schools. If all of these students had instead attended the Loachapoka school, the percentage of the enrollment at Loachapoka consisting of black students would have been reduced by 5.24%, from 96.44% to 91.20%. The government contends that these transfers of Lee County students to Opelika in the years following 1970 support a further order requiring Opelika to participate in the desegregation of the Loachapoka school because the continued acceptance of transfers during this period contributed to the current racial identifiability of Loachapoka. The government argues that these transfers, by diminishing the number of whites at Loachapoka, discouraged and continues to discourage other whites from attending school there.
 
 
 70
 The record is, however, devoid of evidence tending to establish that other whites would have been more likely to attend the Loachapoka school if those white students who transferred to Opelika schools had instead been in attendance at Loachapoka, thereby making the school 91% rather than 96% black. This increment of change in the racial composition of a school seems unlikely to alter significantly general perceptions of a school's racial identity or the behavior of persons who rely on such factors in determining whether or not to send their children to a particular school. Thus, we believe that these transfers, which involved only a handful of students, cannot, when considered apart from the earlier interdistrict transfer activity, be considered to have had the type of significant, interdistrict segregative effect which Milliken requires as a predicate for an interdistrict remedial order. Nor, given the small number of students involved, and the fact that the Opelika schools have, since 1978, adhered to a policy of accepting no transfer students, do we find it reasonable to conclude that this small number of transfers effectively perpetuated the segregative effect of earlier actions and that consequently those actions may thus be deemed a significant cause of the current racial composition of the student body at Loachapoka.
 
 
 71
 This case does not involve the question whether, by continuing to accept some white transfer students from the Loachapoka zone in the years between 1970 and 1978, Opelika was in violation of the Singleton transfer provision contained in its 1970 desegregation order. A finding that a school district has accepted transfer students in violation of a Singleton clause customarily supports injunctive relief forcing an end to such transfers and compliance with the terms of the desegregation order. A finding that a district has violated a Singleton transfer provision included in its desegregation order does not, in and of itself, support a broader, interdistrict remedial order unless the conduct which violated the Singleton clause also comprised an interdistrict constitutional violation when evaluated under Milliken.
 
 
 72
 In any event, the Opelika school system has now brought itself into full compliance with the 1970 desegregation order by adopting and implementing a "no transfers" policy. Although a Singleton transfer provision by no means requires a school district to stop accepting any transfer students, a school district may choose, as Opelika apparently has, to adopt such a policy as a means of assuring full compliance with the requirements of a Singleton provision. By adopting such a policy, a school district avoids the administrative burden and expense of identifying the home school and home district of each transfer student and of determining the effect of the transfer on the transfer students' home schools and districts as well as on its own schools.[13] Of course, if at some point in the future, Opelika should choose to modify its current "no transfers" policy, any new policy must be designed and administered in full compliance with the Singleton clause.
 
 
 73
 Although Auburn terminated its transfer program in accordance with the 1971 court order, the government contends that the subsequent annexations of areas adjacent to the city's southern and western boundaries support an interdistrict remedial order affecting Auburn. The district court found that the expansion of the City of Auburn, and the concomitant expansion of the Auburn school district, contributed to the diminution of whites at Loachapoka. The court concluded, however, that the annexations would not support an interdistrict remedial order because Auburn had not acted with any discriminatory motive in annexing these areas, and thus, under Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the annexations did not violate the Constitution. On appeal, the government argues that the district court erred in requiring a showing of intent. The government contends that under Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), the finding that the annexations by Auburn adversely affected desegregation efforts at Loachapoka mandates an order partially invalidating these annexations insofar as school district lines are concerned and reestablishing the school district boundaries and school attendance zones existing prior to the annexations.
 
 
 74
 Wright involved a city's effort to secede from a county school district, of which it had always been a part, shortly after the county district was ordered to implement a desegregation plan. The Supreme Court upheld the propriety of an injunction prohibiting the creation of the new district because it found that the removal of students, territory and facilities involved in such a process would adversely affect the desegregation efforts of the original school district. The government argues that the annexations involved in this case had an effect analogous to the creation of a splinter district and relief similar to that ordered in Wright should be ordered here.
 
 
 75
 Although Wright involved efforts to create a new school district, it was a case about intradistrict school desegregation remedies and not about interdistrict relief. Wright involved the propriety of enjoining the creation of a splinter school district as a means of ensuring the effectiveness of an intradistrict remedial plan already ordered for the original school district. Wright deemed it appropriate for a federal district court, in the exercise of its equitable remedial powers invoked on the basis of a previously determined intradistrict condition of unconstitutional school segregation, to bar the creation of a new school district from territory lying within the territorial jurisdiction of the original district. The relief approved in Wright did not rest upon a finding that the creation of the separate city district constituted an independent constitutional violation; consequently, there was no need to examine the issue of intent. As the Court emphasized when it discussed the meaning of Wright in Washington v. Davis, supra, in cases such as Wright, where the question presented is whether the challenged action is consistent with "an outstanding order of a federal court to desegregate (a) dual school system," there is no need to find an " 'independent constitutional violation,' " and thus, no need to find a discriminatory motive, in order to enjoin the challenged conduct. A Wright -type injunction is not a grant of further or broader relief than that already ordered, but is, instead, a means of ensuring that the original remedial order is not evaded or eviscerated. In such circumstances, effect is properly the only inquiry.
 
 
 76
 A request for an interdistrict desegregation remedy, is quite another matter. Such a remedy is properly ordered not upon a showing of effect alone but only after the court is convinced that the challenged conduct was an interdistrict constitutional violation because, first, it was motivated by a discriminatory animus as required by Washington v. Davis, supra, and, second, it had a significant interdistrict segregative effect as required by Milliken. Thus, Wright differs from Milliken in two important respects; first, because Wright involved an intradistrict, rather than interdistrict, problem and second, because Wright involved questions concerning the appropriate exercise of a district court's remedial powers rather than the definition of prerequisites for establishing a constitutional violation.
 
 
 77
 These distinctions are, we think, important because, after carefully and thoroughly examining the pleadings, trial briefs and hearing record in this case, we have found nothing to suggest that the government ever presented to the district court a request for injunctive relief invalidating the annexations (insofar as they altered school district boundaries) based on Wright.[14] At the district court level the only claim asserted by the government was that Auburn and Opelika had committed interdistrict constitutional violations which contributed to the current condition of segregation at Loachapoka and the relief consistently requested was an order requiring the Auburn and Opelika school districts to participate in an interdistrict remedial plan to desegregate the Loachapoka school. Although the factual issues concerning the annexations, which the government now claims might support a claim for relief under Wright, were developed in the hearing before the district court, the evidence concerning the annexations was presented to and evaluated by the district court within the framework of a claim for interdistrict relief under Milliken. The district court was never asked to evaluate, according to the standards enunciated in Wright, the propriety of an injunction invalidating the annexations insofar as they altered school district boundaries.
 
 
 78
 The determination of the propriety of Wright -type relief is, as the Supreme Court emphasized in Wright, one reserved primarily to the equitable remedial discretion of the district court charged with supervising the desegregation efforts in the affected school district. Since no claim for Wright -type relief was presented to the court below, it would be improper for us to reevaluate the evidence adduced at the hearing in light of a legal claim not presented below, especially when the determination of the merits of that legal claim is one primarily reserved to the remedial discretion of the district court.[15] Our appellate review in this case is thus, properly confined to the question presented and considered below,i. e., whether the annexations were interdistrict constitutional violations or perpetuated the affects of earlier violations. The district court found that "the expansion of Auburn has contributed to the diminution of whites at Loachapoka." However, the district court did not make any explicit finding concerning the extent of this effect, a finding necessary to support interdistrict relief under Milliken. Our review of the evidence in the record has convinced us that the government failed to adduce any evidence which would have supported the necessary finding by the district court that these annexations had a significant interdistrict segregative effect.
 
 
 79
 It is undisputed that between 1971 and 1977, the Auburn City Council approved twenty-four annexation ordinances. These ordinances were drafted and approved by the council in response to petitions from persons owning property contiguous to the Auburn city limits. At the hearing before the district court, the government introduced evidence that, as of the 1977-78 school year, 227 school children lived in areas that had been annexed to the city since 1971. Of these, 156 were white and 71 were black. If all of these students were now assigned to attend the Loachapoka school, and did in fact attend Loachapoka, the white student population at the school would increase from about 4% to approximately 21%.
 
 
 80
 The government asserts that these figures prove that the annexations had a significant segregative effect on Loachapoka. In making this assertion, however, the government is assuming that but for the annexations these 227 students would be living in areas zoned to attend Loachapoka rather than city schools. This assumption is flawed.
 
 
 81
 There is evidence in the record indicating that many of the students now residing in the annexed areas were not living there at the time of the annexations. There is no evidence in the record tending to establish that the families of these children would have taken up residence in these same areas if they had not been part of the city. Thus, as to these children, it cannot be said that but for the annexations they would be residing in an area zoned to attend Loachapoka. Although the record establishes that the annexed areas were formerly part of the Loachapoka zone, the record is silent on the question whether or not children who moved into these areas after the annexations would have done so if the annexations had not made these areas a part of the city.
 
 
 82
 On this record then, the annexations can properly be found to have caused a change in school assignments only for those school children residing in the annexed areas at the time of annexation. Thus, it is the number and race of these school children which must be examined in order to determine whether the annexations had a significant inter-district segregative effect. The government produced virtually no evidence on this critical fact. Neither the size and racial composition of the general population, nor the number and race of the school children living in these areas at the time of the annexations, is documented in the record. At the hearing before the district court, the government introduced a map which purported to indicate the number and race of the persons owning property in the annexed areas as of the date each area was annexed. This figure does not, of course, necessarily describe the actual population of the area and is even less probative of the number and racial characteristics of the school age population residing in the area at the time.[16]
 
 
 83
 The only evidence in the record from which one may attempt to discern the number of school children living in the annexed areas at the time of these annexations is evidence tending to establish how many of the 227 children currently living in these areas were not living there at the time of the annexations. Most of this evidence was introduced in testimony elicited by counsel for Auburn. Of the 156 white children living in the annexed areas as of the 1977-78 academic year, 109 lived in two subdivisions, the Whippoorwill subdivision and the Willow Creek subdivision. Both of these subdivisions were annexed to the city in 1972. At the time of annexation, only two white school children lived in Whippoorwill; ten lived in Willow Creek.
 
 
 84
 From these figures we can conclude that at least 97 of the 156 white students now living in the annexed areas moved into these areas after annexation. Thus, if one presumes that all the other white school children living in other annexed areas were living there at the time of the annexations, a rather unlikely assumption, there could have been no more than 59 white school children living in the annexed areas at the time of annexation. There is no evidence in the record from which we can determine how many of the 17 black students living in the annexed areas as of the 1977-78 school year were residing in these areas at the time of annexation.
 
 
 85
 If we presume that none of the black children were living in these areas at the time of annexation, and that 59 white students were residents of these areas at that time, in order to determine the maximum possible effect of these annexations, we reach the following conclusion: If 59 more white students, and no more blacks, had attended the Loachapoka school during the period from 1972 to 1976, when the annexations occurred, the percentage of whites in the student body at Loachapoka would have increased by no more than 8.6%.[17] In short, even construing our sparse information so as to give maximum possible effect to the annexations, it is evident that even if these annexations had not occurred, the Loachapoka school would have remained a predominantly black school, with 87.4% of its enrollment consisting of black students.
 
 
 86
 We decline to consider whether an 8.6% change in the racial composition of the Loachapoka school would meet the threshold of significant interdistrict segregative effect established by Milliken because on the record in this case, this figure is based upon so many layers of presumptions unsupported by any evidence, and often contrary to probabilities, that the question here cannot properly be posed as whether this 8% is a significant effect under Milliken. There is insufficient evidence in this record to establish this figure, or any figure, as an accurate measure of the annexations' effect. The government, the proponent of interdistrict relief in this case, had the burden of proving that these annexations had a significant interdistrict effect. On the record of this case, which reveals no evidence concerning the school population of the annexed areas at the time of the annexations, it cannot be gainsaid that this burden has not been met. Nor, on this sparse record, can we find that the annexations carried forward the effects of the earlier transfer system. There is nothing in the record tending to indicate that the transfer students resided in the annexed areas. Even assuming that there were 59 white students affected by the annexations, this number would be less than one-third of the students who were transferring into Auburn in the 1970-71 school year.
 
 
 87
 With regard to the question whether these annexations were undertaken with a racially discriminatory motive, the district judge found that there was no such discriminatory motive at work here, and we have found nothing in the record to suggest that this finding was clearly erroneous. The Supreme Court has now made clear that for purposes of equal protection analysis, a finding of discriminatory intent requires more than the sort of objective intent employed in civil and criminal law, which presumes that a person intends the natural and foreseeable consequences of his voluntary actions. A finding of discriminatory purpose or intent requires a finding that a public decisionmaker embarked upon the challenged course of action "at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 277-280, 99 S.Ct. 2282, 2295-96, 60 L.Ed.2d 870 (1979).[18] Although Feeney makes clear that the intent required to support a finding of unconstitutional discrimination is a species of specific rather than general intent, Feeney did not alter the decisions in Washington v. Davis, supra, or Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), where the Court noted that a racially discriminatory intent might properly be inferred from circumstantial evidence.
 
 
 88
 Both before the district court and on appeal, the government has contended that the timing of some of the annexations supports an inference that they were racially motivated. Thirteen annexation ordinances affecting areas located wholly within the Loachapoka school attendance zone, and one ordinance involving territory partially within that zone, were adopted in the first year following the entry of the court order mandating the eventual termination of transfers from the Loachapoka area into the Auburn schools. The government claims that the fact that so many annexations occurred in such a short period following the court order is strong circumstantial evidence that these actions were taken in order to evade the effect of the court order and to perpetuate segregation at Loachapoka.
 
 
 89
 Auburn posits an alternative explanation for the timing of these annexations. Prior to the 1971 order, Auburn apparently attempted to annex substantial areas of territory to the north, west and south of the city but was unable to get the requisite approval from the state legislature. Shortly after these unsuccessful attempts, the Alabama legislature enacted a statute allowing cities to annex land contiguous to the city limits upon petition from the owners of the affected area and without approval by the state legislature. Thus, Auburn asserts that the boom in annexations during 1972 was a natural part of, and response to, the city's growth which previously had been unduly inhibited by the legal requirements for annexation under Alabama law. This assertion was supported by the testimony of persons who served on the Auburn city council during the early 1970's and by the introduction of maps prepared for the council at that time, which showed the areas Auburn had unsuccessfully attempted to annex prior to the court order. Given this evidence supporting Auburn's alternative explanation for the timing of these annexations, the timing alone would not seem to support an inference of discriminatory motive. There is little else in the record to support such an inference.
 
 
 90
 The direct evidence of the motives of those involved in effecting the annexations is likewise unpersuasive when measured against Feeney's standard. Numerous persons testified that the Auburn schools, as well as the city's utilities, streets, fire and police protection, were among the motivating factors in their decision to seek annexation. There was, however, nothing to indicate that this preference for Auburn schools was racially motivated. The Auburn schools, even at the time of the early annexations in 1972, were apparently fully integrated. There was testimony from at least one parent that none of the county schools, including those in which whites were a majority, provided college preparatory programs comparable to Auburn's and for this reason the Auburn schools were preferred. There seems to be no question that there are substantial differences between the educational programs and facilities available in the Auburn schools and those generally offered in the county schools. These differences are largely a function of the fact that Auburn has levied special city school taxes which, during the school year 1977-78, added almost $450,000 to the school budget.
 
 
 91
 Of course, the relevant state of mind here is not that of the private persons who requested annexation but that of the city council which took official action to approve the petitions. Although there was testimony that the council was aware that persons desired annexation in order that their children might attend Auburn schools, nothing indicates that approval of the annexations was motivated by a desire to increase the number of whites in Auburn schools or an intent to perpetuate the segregation of blacks at Loachapoka. There is no evidence that the council refused requests for annexation from blacks while approving petitions from whites. To the extent that one can rely on the government's map purporting to indicate the number and race of the property owners in the annexed areas at the time of annexation, one must conclude that substantial numbers of blacks as well as whites successfully petitioned for annexation to the city.[19] This fact seriously undermines any inference that the annexations were undertaken with a desire to adversely affect blacks.
 
 
 92
 There is one other factor which, we think, tends to indicate both that the annexations did not have a significant segregative effect and that they were not racially motivated. Although many of the annexations occurred during a period in which the Auburn and Lee County school districts and their relationship were under intense judicial scrutiny, and in the immediate aftermath of the litigation regarding the expansion of Loachapoka and the termination of transfers, neither the government, nor the private plaintiffs who were active in these desegregation cases at that time, challenged these annexations at the time they occurred. Even before Wright, legal support for such a challenge could arguably have been found in Fifth Circuit cases such as Lee v. Macon County, 448 F.2d 746 (5th Cir. 1971), a desegregation case probably well known to people in Lee County because it involved the county immediately west of their own. We think that under these circumstances, the failure to challenge these annexations at the time they occurred strongly suggests that these actions were not perceived to have a significant effect on desegregation efforts at Loachapoka and also indicates that the annexations probably were not perceived as racially motivated.
 
 IV. SUMMARY
 
 93
 There is little room for dispute that there was a predominantly black school at Loachapoka during the era of de jure school segregation in Lee County and that today the Loachapoka school, although consolidated with a formerly white elementary school and expanded to offer a high school curriculum, continues to be a predominantly black school. Under Swann, of course, the continued existence of a one-race school in a system having a history of de jure school segregation is presumed to be the result of unconstitutional racial segregation historically practiced by that school system. Thus, if we were here confronted with a request that the Lee County School Board be ordered to develop and implement a new desegregation plan in order to alleviate the racial segregation at Loachapoka, we would be correct in presuming that a further remedy was appropriate. Such an order would be entered unless the county school board came forward with evidence to establish either that the racial character of the Loachapoka school was not a vestige of the former dual school system, or that given the peculiarities and extraordinary difficulties involved in desegregating Loachapoka, it was permissible to allow it to continue to exist as a one-race school.[20]
 
 
 94
 The question whether Lee County should be required to undertake further efforts to desegregate the Loachapoka school is not, however, now before us. The request which has been made, first of the district court and now of us, is to order Auburn and Opelika to take action in conjunction with Lee County to desegregate Loachapoka. In order to justify such an order it was necessary to establish that Auburn and Opelika were somehow liable for the continuing condition of segregation at Loachapoka, and that they had an unfulfilled remedial obligation to assist in desegregating that school. The government's task was to prove, in the language of Milliken, "an interdistrict violation and an interdistrict effect." The interdistrict school desegregation cases make clear that the continued existence of a one-race school within one school district does not support an interdistrict order requiring other school systems to participate in the desegregation of that school unless an interdistrict violation is established, regardless of how difficult or even impossible it appears to be to desegregate that school on an intradistrict basis.
 
 
 95
 The motion for further interdistrict relief made numerous allegations of interdistrict violations. But our review of the evidence in this case has revealed that at several crucial points the record is devoid of convincing evidence, and sometimes devoid of any evidence, concerning facts essential to a determination whether interdistrict relief is warranted in this case. In the case of the allegation that the practice of interdistrict student transfers, common in the period prior to 1970, supported an interdistrict remedial order, the evidence fails to establish any causal link between those now-abolished transfer policies and the current conditions at Loachapoka. The evidence concerning Opelika's continued acceptance of transfer students following 1970 involved such a small number of students that this now discontinued practice cannot be deemed to have formed a meaningful causal link between the earlier transfer practices and current conditions at Loachapoka. Nor did such actions constitute an independent, interdistrict violation under Milliken.
 
 
 96
 The absence of evidence in the record to justify an interdistrict remedial order is nowhere more evident than in the evidence concerning Auburn's annexations. None of the evidence in the record provided the information crucial to the determination whether the annexations had a significant segregative effect on Loachapoka, a finding necessary to support an interdistrict remedy. Evidence concerning the motivation behind the annexations was contradictory and inconclusive.
 
 
 97
 On this record, the district court found that there was insufficient evidence to prove that the continued existence of a one-race school at Loachapoka was the result of interdistrict constitutional violations involving Auburn and Opelika. The district court found instead that the continued predominance of blacks in the student body at Loachapoka was a result of the demographic fact that the western and southern areas of Lee County have historically been and continued to be predominantly black. The court did not find, nor was there any evidence from which it could have found, that this pattern of residential segregation was the result of any unconstitutional governmental action. We have found nothing in this record to persuade us that these determinations of the district court are clearly erroneous.
 
 
 98
 The judgment of the district court denying the motion for interdistrict relief is affirmed.[21]
 
 
 99
 AFFIRMED.
 
 
 100
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TUTTLE, Circuit Judge, dissenting:
 
 101
 Respectfully, I dissent.
 
 
 102
 I agree that unless the school districts of Auburn and Opelika have committed acts that have either created segregative results or continued the past effects of segregation it would not be proper to require an interdistrict remedy. Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).
 
 
 103
 My disagreement with the majority lies in my conclusion that, upon the facts stated in the opinion, there has been such conduct by the two city school boards that would require us to seek a remedy that would be commensurate with the harm done. Such a remedy would be for us to affirm the order of the trial court with a single proviso: that the three districts be subject to a Majority to Minority transfer plan, such as has been mandated for every school desegregation decree in this circuit since Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir.), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970). The effect of such a policy would be to permit those black students in Loachapoka who aspire to at least a few grades at a desegregated school to transfer to the schools of Auburn or Opelika in which their race is the minority.
 
 
 104
 Singleton deals only with a single school district, but I am sure the majority would agree with me that it would be applicable across district lines, if the record required our finding the essential interdistrict involvement. I find such involvement with respect to both cities.
 
 
 105
 In 1970, Opelika was enjoined from accepting transfer students "where the cumulative effect will reduce desegregation in either district or reinforce the dual school system." In spite of this command, Opelika continued to accept transfers through the 1977-78 year without giving any consideration to the effect on Loachapoka. As of the 1977-78 year, 54 Loachapoka area children were accepted by Opelika in violation of the court's decree. This was the situation at the time the trial court entered its order that is here on appeal. If the 37 white and 17 black children attending Opelika schools had gone to Loachapoka this would have increased the white attendance at that school from 3.66 to 8.9%. I consider this a significant desegregative change, although I note that Singleton does not speak in terms of "significant" effects. It enjoins any transfers that will reduce desegregation in either district or reinforce the dual school system." These acceptances in violation of the courts injunction does both. Moreover, I think the Opelika figures should be combined with the Auburn figures, discussed below, to determine the question of "substantiality."
 
 
 106
 The majority approves the trial court's ignoring these Singleton violations on the ground that Opelika promised to stop and sin no more. Although it may have been proper for the court to decline issuing a further injunction against a further disobedience of its earlier order, this has nothing to do with the case. What we are concerned with is to determine whether Opelika had, down to the filing of this motion, acted unconstitutionally in a manner to frustrate desegregation of Loachapoka. It did, and it makes no difference that it says that it will stop. Of course it will stop or someone will be in contempt of court. I cannot think of a clearer case of conduct by a district having a segregative effect on another district.
 
 
 107
 I now turn to Auburn. That city's school district, in 1970, resisted the inclusion of a Singleton provision in its desegregation decree. As noted in the majority opinion "this omission does not appear to have been an oversight .... Auburn requested the court to allow it to continue accepting county students on a space available, nondiscriminatory, basis even though it admitted that it was very likely that the practice would have an adverse effect on desegregation in Lee County." Footnote 6, majority opinion (emphasis added). Clearly, the court erred in permitting this violation of the circuit-wide mandate of Singleton. Can we say that Auburn did not commit an unconstitutional act when it demanded and got the right to continue interfering with the very difficult desegregation efforts being made by Lee County?
 
 
 108
 Auburn continued to accept the transfer of a predominantly white number of county students through the school year 1973-1974. For the year 1971-72, the parties stipulated that approximately 205 white and 51 black students from the Loachapoka area were attending Auburn schools. Their attendance at Loachapoka would have changed the racial composition from 97% black to 75% black. Considered in connection with the effect to the Opelika transfers, I figure this figure would be reduced to approximately 66%. I am sure the majority would agree that this number is significant and substantial. This then is more than sufficient action by Auburn to make an interdistrict remedy appropriate.
 
 
 109
 But there is more. In 1974, the Auburn school district passed a resolution cutting off all transfers. In the meantime, the white children who would otherwise have been assigned to Loachapoka remained in attendance at the Auburn schools, because by 1974 eleven areas that had been in the Loachapoka attendance zone had been annexed to the City of Auburn. The trial court found that "the expansion of Auburn has contributed to the diminution of whites at Loachapoka." Apparently the trial court considered this to be significant.
 
 
 110
 The United States contends that these annexations were racially motivated and had a segregative effect. The proof of such motivation was, as stated in the majority opinion, insufficient for us to find the district court's finding to the contrary clearly erroneous. I do not reach the question of the burden of proof because I am convinced that these annexations are similar to the action of the City of Emporia in Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). In that case the City of Emporia had, until a desegregation order was entered by the district court, permitted its children to be educated as a part of the Greensville County school system. When an order of "pairing" students was entered by the court, the City of Emporia, as it was otherwise legally permitted to do, notified the county board that it was setting up its own city school system. The effect of this was to withdraw a disproportionate number of white students from the county-wide system and thus increase the already high percentage of blacks left in the county schools. The Supreme Court affirmed an injunction against such withdrawal of a disproportionate number of white children from the county schools at a time when the trial court was dismantling a dual system. The Court looked only to effect. It said
 
 
 111
 We hold only that a new school district may not be created where its effect would be to impede the process of dismantling a dual system.
 
 
 112
 407 U.S. 451, 470, 92 S.Ct. 2196, 2207, 33 L.Ed.2d 51 (emphasis added).
 
 
 113
 This is exactly what happened in Auburn. While the court was holding hearings and entering and modifying orders to effect desegregation of Lee County schools, and particularly the Loachapoka school, the City of Auburn annexed eleven different areas that formerly were within the Loachapoka attendance zone. I think that under such circumstances, Wright would authorize this court to cause the trial court to ignore these new lines and treat Auburn and Lee County as a single district to the limited extent of requiring the addition of a Majority to Minority attendance plan between the county and the City of Auburn.
 
 
 114
 I do not understand the view stated in the majority opinion that we should not consider the Wright case because the government did not raise the issue below. The opinion states "at no point in the proceedings before the district court did the government request limited relief in the form of partial invalidation of the annexations."
 
 
 115
 In the first place, I do not find anything in Auburn's briefs here contending for such a position. In the second place, I find the government's motion for further relief by way of a plan by all defendants entirely consistent with its contention that limited crossing of city boundaries is justified by Wright.[1] In fact, the Wright case was cited to the district court and cited by it as the basis of the government's contention that "in a situation such as this, effect, not purpose or motivation, of the state action was to be examined."
 
 
 116
 In sum, I think the clear and open violations by Opelika of the Singleton rule, resulting in the siphoning off of white children from Loachapoka, the insistence by Auburn that it be permitted to violate this court's Singleton order and its four year violation, resulting in a very substantial withdrawal of white children from Loachapoka at the very moment that Lee County was seeking to meet the projected white attendance figures, either separately or combined with the carving out of what amounts to a new school area by the annexations to Auburn, constitute current unconstitutional acts that meet the Milliken standard.
 
 
 117
 As stated originally, I would require only a limited modification of the court's decree by mandating a county-sponsored Majority to Minority plan. This would permit such of the black students of Loachapoka as wished to do so to have a partial school life that is not segregated on account of race. Moreover it is a transfer that the City of Auburn seemed perfectly willing to accommodate prior to the entry of the desegregation order, when it accepted all transfers.
 
 
 118
 I would limit the relief in this manner because of the trial court's finding that the Loachapoka school has become an excellent school which holds the loyalty of its patrons, and because no named plaintiff has requested the relief which the United States as intervenor here claims for them.
 
 
 
 [1]
 Although the district court excluded evidence concerning the history of these school districts prior to 1970, the record on appeal in this consolidated action includes the records in the earlier, separate desegregation proceedings involving these school districts. These records, which contain a substantial amount of information concerning the pre-1970 operations of all the school districts involved (along with some pre-1970 evidence which was introduced in this proceeding), have formed the basis for this portion of the factual summary
 
 
 [2]
 At an early stage in the desegregation process, the court ordered grades 7-9 of the Loachapoka Junior High School closed by the beginning of the academic year 1969-70. In the spring of 1969, however, that order was amended to provide that instead of closing grades 7-9, the Loachapoka Junior High and the Loachapoka Elementary School would be merged into one school having grades 1-10. This plan did very little to desegregate the Loachapoka school; it remained virtually all black. Of the 61 whites attending Loachapoka in 1969-70, all were in grades 1-6. Grades 7-10, housed at the old Loachapoka Junior High School building, were all-black
 
 
 [3]
 The other three zones were:
 (1) Beulah zone, lying immediately north of Opelika and covering the northeastern sector of the county. Students living in this area were to attend grades 1-12 at the Beulah High School. Projected enrollment for the school was 317 white students and 190 black students.
 (2) Smith's Station/Salem zone covering the large rural area in the eastern part of the county. Three school facilities were located within this area. Grade 1 was assigned to Smith's Station Elementary School; projected enrollment was 141 white students, 105 black students. Grades 2-6 were to be housed at the Smith's Station High School; projected enrollment was 642 white students, 407 black students. Grades 7-9 were to attend Wacoochee High School; projected enrollment was 402 white students, 212 black students. Grades 10-12 were also assigned to the facilities at Smith's Station High School; these grades were expected to include 263 white students and 192 black students.
 (3) Beauregard/Sanford zone encompassing the southern part of the county. The two school facilities in the southern part of the county, the Beauregard school and the Sanford school, were paired. Beauregard housed students in grades 1-3 and 10-12; the projected enrollment at Beauregard was 345 white students and 375 black students. Students in grades 4-9 were assigned to Sanford, which was expected to have 359 white students and 330 black students.
 
 
 [4]
 Although such a situation is something less than an ideal desegregation plan, a one-race school has sometimes been permitted to continue if circumstances make desegregation exceptionally difficult and if students assigned to that school have opportunities to attend an integrated school during another part of their schooling. See e. g., Carr v. Montgomery County Board of Education, 377 F.Supp. 1123 (M.D.Ala.1974), aff'd 511 F.2d 1374 (5th Cir.), cert. denied, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975), and Stout v. Jefferson County Board of Education, 537 F.2d 800 (5th Cir. 1976)
 
 
 [5]
 This designation derives from Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir.), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970), in which this provision restricting transfers was first included in a desegregation order
 
 
 [6]
 This omission does not appear to have been an oversight. In the hearing prior to confirmation of the plan, the problem of out-of-district transfers created by the geographical and historical relationship between the Auburn City and the Lee County school systems was extensively discussed
 Counsel for Auburn argued that the Singleton transfer provision should be omitted from the Auburn plan because "Auburn has, historically and traditionally, educated out of district students." Counsel argued that this common practice reflected geographical and educational, not racial, concerns. Auburn schools were often more convenient to the homes of county residents and, as a result of the presence of a university community and higher city taxes, Auburn's schools were generally perceived to be stronger academically than county schools. Auburn requested the court to allow it to continue accepting county students on a space available, non-discriminatory basis even though it admitted that it was very likely that this practice would have an adverse effect on desegregation in Lee County.
 At the hearing, the government opposed the continuation of interdistrict transfers. The government argued that most of the county students attending Auburn schools were white and that permitting voluntary transfers to continue would, in effect, make Loachapoka a dual attendance zone where most black children would attend the county school at Loachapoka where blacks were a substantial majority; at the same time, whites would be free to attend Auburn schools, which, although effectively desegregated under the Auburn plan, would have a majority of white students. The government also reminded the court that a Singleton transfer provision had been included in the Lee County plan approved several months earlier and that the enrollment projections in that plan had been premised upon attendance of all children residing outside of Auburn and Opelika in county schools. The government did not insist that all attendance by county students at city schools should stop, recognizing that overcrowding at Loachapoka would result if such a proposal were strictly enforced. The government did, however, insist that a Singleton transfer clause should be included in the Auburn plan so that any transfer policy employed in the future would not reinforce the segregated situation in county schools.
 After considering the arguments made at the hearing, the court approved the Auburn plan substantially as submitted by the Auburn Board of Education.
 
 
 [7]
 In May, 1970, the county sought the court's permission to construct high school facilities at Loachapoka in order to avoid hardships created by the bussing of students to Beauregard. The government opposed the motion, noting that as a result of the court's approval of the Auburn plan, which allowed Auburn to continue to accept county students, the white enrollment at Loachapoka would be significantly less than projected in the original plan. The county's motion was denied because the court concluded that expanding the facilities at the predominantly black Loachapoka school might "operate to substantially decrease the desegregation in the Lee County School System."
 In July, 1970, the county filed a similar motion requesting permission to expand the Loachapoka school. In its motion the county estimated that if a high school program were added to the Loachapoka curriculum, the school would have 653 black students and only 81 whites and thus be 89% black. This estimate apparently reflected the county's expectation that in light of the permissive transfer clause in the Auburn plan, 184 whites who resided in Loachapoka but attended Auburn schools in 1969-70 would continue to do so in 1971. The county's motion was again opposed by the plaintiffs and the government who noted that in light of the expected continuation of interdistrict transfers under the Auburn plan, the only opportunity for a racially integrated educational experience available to Loachapoka students would be their attendance at Beauregard High School. This opportunity would be foreclosed if high school facilities were constructed at Loachapoka. The county's motion was again denied. The county urged the motion upon the court a third time during 1970 and it was summarily denied.
 In January, 1971, Lee County presented its request for permission to build high school facilities to the court for a fourth time. During the school year, 1970-71, Loachapoka had 590 black students and 74 white students; 94 black students and 17 white students residing in the Loachapoka attendance area were bussed to Beauregard for high school. During this same academic year the Alabama Department of Education conducted a school population survey which indicated that there were 687 black and 346 white school age children residing in the Loachapoka area. 202 of these white children and 4 blacks attended Auburn schools during this academic year. Based on these figures, the Lee County Board predicted that if all pupils living in the Loachapoka area who attended public schools in 1970-71 attended the Loachapoka schools, there would be a total of 718 black children and 253 white children in the Loachapoka school. Under these circumstances the Loachapoka school was projected to be 73% black.
 The government again opposed the expansion of the Loachapoka school arguing that "the proposed revision of the plan would increase substantially the number of black students at the Loachapoka schools without any appreciable increase of white students, thus diminishing the degree of desegregation achieved under the plan approved on February 4, 1970." The government suggested that the county consider construction of a new high school facility at a site between Beauregard and Loachapoka or make an agreement with Auburn providing for the education of all Loachapoka children in certain grades in Auburn schools, thereby providing children from Loachapoka with at least some opportunity to attend a racially integrated school. The county's fourth motion was denied in February, 1971.
 
 
 [8]
 "Nevertheless, there is sufficient evidence in the existing record upon which to conclude that Auburn and Opelika directly contributed to the operation of the dual system in Loachapoka." Brief for the United States at 28, n.13
 
 
 [9]
 As will become apparent, however, we do not accept all of the conclusions that the government urges us to draw from these facts
 
 
 [10]
 In Calhoun v. Cook, 522 F.2d 717 (5th Cir. 1975), we examined the efforts of the Atlanta district to devise an intradistrict school desegregation plan and observed that given the fact that 85% of the students in the district were black, the prospects for any substantial intradistrict desegregation of the city schools were bleak
 
 
 [11]
 The court observed that for many years there was only one black high school in metropolitan Atlanta and that it served students from districts located throughout the six-county area
 
 
 [12]
 The record in this case contains nothing remotely comparable to the evidence adduced in the Atlanta case concerning past governmental action to establish and perpetuate residential segregation. In Armour, the court found that in the past the City of Atlanta had explicit residential zoning ordinances designating certain areas of the city for blacks and others for whites, that the city used other zoning devices to create buffers between residential areas occupied by persons of different races and that sites for public housing projects were consciously chosen to reinforce patterns of residential segregation in the metropolitan area
 No evidence of discriminatory zoning practices was produced in this case, nor was there any evidence tending to suggest that the predominance of blacks in the population of western Lee County was caused by actions of the cities which discouraged black residence in the urban areas.
 
 
 [13]
 Lee v. Eufaula City Board of Education, 573 F.2d 229 (5th Cir. 1978), established that in determining whether the "cumulative effect" of a transfer program violates the terms of a Singleton clause, the effect is to be measured on a "school-by-school" basis. We note that prior to the gloss which Eufaula placed on the meaning of the language in the Singleton transfer clause, it was not unreasonable for a school district to interpret that language as prohibiting only those transfers which had a district-wide adverse impact. There could be no plausible contention here that Opelika's continued acceptance of a small number of transfer students in the years following 1970 had a significant detrimental effect on the overall desegregation of either the Opelika or Lee County district. Returning all of these transfer students to Lee County schools would have increased the percentage of black students in the Opelika schools by 1.16% and decreased the percentage of blacks in Lee County schools by .95%. Nor did the transfers significantly alter the racial composition of any individual school in Opelika; the maximum change in the racial composition of any Opelika school resulting from the transfers was .44%
 The opinion in Eufaula was issued in May, 1978. Opelika adopted its no transfer policy in January, 1978, to be effective with the school year 1978-79. This sequence of events suggests that Opelika even prior to 1978 made a good faith effort to comply with the Singleton provision as it was then reasonably interpreted.
 
 
 [14]
 In the proceedings before the district court, the government cited Wright in support of an argument quite different from the one it is urging on appeal. At trial, the government apparently posited the theory that all of the school districts in Lee County were really only one system during the period of de jure school segregation and thus Auburn and Opelika were really splinter school districts whose fates were governed by Wright. Thus, in the memorandum of law which the government filed in support of its motion for interdistrict relief, the government asserted that all three of the school districts in Lee County "were operated as if they constituted one school district" and thus Swann's presumptions about the causes of intradistrict segregation and Wright's prohibition of the creation of splinter school districts during the process of desegregation in the original district required that Auburn and Opelika participate in efforts to desegregate the Loachapoka school
 In its pre-trial brief, the United States reiterated this argument by asserting that "the interdistrict student transfers had the effect of all three school districts operating as if they were one school district" and thus Wright would apply to bar Auburn and Opelika from being deemed independent school systems until the desegregation of the Lee County schools was complete. Nowhere in the briefs or memoranda filed with the district court did the government suggest that it was Auburn's annexations which violated Wright rather than Auburn's and Opelika's operation of independent school districts.
 
 
 [15]
 Because the government did not present a request for Wright -type relief below, we are not called upon here to determine the applicability of Wright and other splinter school district cases to a situation involving municipal annexations. The process of annexation, which has the effect of reassigning students from the county to the city schools, is in some respects analogous to the situation created when a splinter school district is established. We note, however, that there are a number of significant differences between Wright, and the cases which have applied its reasoning to bar the creation of splinter school districts, and the situation created by the municipal annexations in the case before us. Without expressing any opinion as to whether any of these differences would make Wright inapplicable to a case involving a series of municipal annexations, such as those which occurred here, we summarize these differences briefly as follows:
 (1) Unlike the creation of a splinter school district which affects only school district boundaries, a municipal annexation involves the expansion of the city limits and the concomitant extension of the services offered by the city (e. g. fire and police protection and utility services) to residents of the annexed areas. Thus, municipal annexation, as distinguished from the creation of a splinter school district, is often motivated by a multiplicity of concerns unrelated to schools.
 (2) The pattern of the annexation process which occurred here reflects the piecemeal acquisition of territory by a city over a period of several years, whereas the creation of a splinter school district typically involves only one partition of territory. This difference would create some difficulties in applying Wright's effect analysis. One would have to decide whether, where, as here, the annexations involved relatively small amounts of territory, each annexation would be analyzed separately under Wright or whether some relevant series of annexations would be defined and examined together to determine whether they had an impermissible effect under Wright. See note 18, infra.
 (3) Each of the splinter district cases has involved the excision of a portion of an existing district that had a much more substantial impact on the original district than is evident here. In Wright and in each of its progeny, the creation of a new district and the change in district boundaries removed a substantial number of students and school facilities from the existing district or produced a significant disparity in the overall racial composition of the districts.
 In Wright the creation of a separate city school district removed 1,123 students from the county district which had formerly enrolled 3,759 students. As a result, the county district, originally 34% white and 66% black, became 28% white and 72% black. The city district was 48% white and 52% black.
 In United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1971), a companion case to Wright, the new city school district was carved out of a county district enrolling 10,655 students. At the time of the city's withdrawal, the county district was 77% black, 22% white and 1% American Indian. The new city district enrolled a little over 1,000 students. About 700 of these were city residents; 57% of this group were white and 43% were black. The city district enrolled 360 transfer students from the county, of which 350 were white. Thus, the new city district, as a result of the combined effect of its boundaries and a substantial transfer program, was almost 75% white and enrolled slightly more than a third of all whites previously attending the county schools.
 In United States v. Hinds County School Board, 560 F.2d 1188 (5th Cir. 1977), the county school district, prior to the city's secession, had been 45% white and 55% black. Immediately following the establishment of a separate city district, the county system was 32% white and 68% black; the city district was 85% white.
 Ross v. Houston Independent School District, 559 F.2d 937 (5th Cir. 1977), involved an effort to establish an independent school system covering a part of the City of Houston. The Houston district had a student population which was 44% white, 39.4% black and 16.6% Hispanic. The area designated to comprise the new district contained 8,000 students; 88.9% of these students were white, only 6.2% were black and 4.9% were Hispanic.
 In this case, there is no claim that the annexations significantly altered the racial composition of either the Lee County or Auburn district as a whole. The claim is only that the annexations hindered Lee County's efforts to dismantle its dual school system by removing whites from the Loachapoka attendance zone. The record is devoid of direct evidence concerning the exact number and race of school children living in the annexed areas at the time of the annexations. By examining information in the record about the number of children now living in the annexed areas and the number who have moved in since the annexations occurred, we can learn that there were no more than 59 white students living in these areas at the time. See text infra at 1267. If these students had attended school at Loachapoka, the racial composition of that school would have been altered by less than 10%.
 The annexations which occurred here, unlike the establishment of splinter school districts in Wright and these other cases, did not have the effect of removing any school facilities from the county district.
 Thus, to apply Wright in this case we would have to extend its prohibition of actions having an adverse districtwide effect on the original school system to encompass a prohibition of any action having an adverse impact on the desegregation of any one school in the original district. We would also have to conclude that the effect of these annexations on the racial composition of the Loachapoka school was significant enough to warrant a Wright -type remedy.
 (4) In the splinter district cases the relief requested was prospective in character. Injunctions were requested in order to prevent the creation of the splinter district. We have found only one case in which relief was granted based on Wright after the splinter district had actually begun operation. In Hinds, supra, a separate municipal school district began operation without approval from the court supervising the county system's desegregation efforts despite notice that such approval was required. Although litigation of the issue was, for some reason not entirely clear from the face of the opinion, delayed for several years during which the municipal school district continued to operate, the future operation of the district ultimately was enjoined.
 In this case no challenge was made to the annexations at the time they occurred. Since we have been unable to discover any case in which Wright has been employed to prohibit annexations, it cannot be said, as was the case in Hinds, that it should have been apparent at the time that Wright would bar these annexations. Only now, after the population in the annexed areas has increased, does the government seek an injunction partially invalidating these annexations. Under these circumstances there are equitable considerations not present in a case such as Wright or Hinds which would militate against a retrospective form of injunctive relief invalidating, at least insofar as school attendance zones are concerned, annexations occurring six to eight years ago.
 We note further, that if we did proceed to analyze the annexations in this case under Wright we would also encounter the same question we confront in our Milliken analysis, see infra, at 1266, i. e., as of what date is the effect of these annexations measured. Since we cannot know, at least given the state of the record in this case, whether persons who moved into the annexed areas after annexation would have taken up residence in the same place had these areas not been within the city limits, we cannot say that these annexations had the effect of removing these persons from the Loachapoka zone. If, then, we conclude that the effect of the annexations which occurred in the year following the 1971 court order prohibiting transfers is to be measured as of that time in order to determine whether Wright -type relief is proper, we would reach the same conclusion we reach when we analyze the effect of the annexations under Milliken. The government has failed to produce direct probative evidence concerning the actual effect of these annexations in terms of the numbers of white pupils removed from the Loachapoka zone as a result of the annexations.
 
 
 [16]
 The map's usefulness in determining the effect of the annexations on the racial characteristics of the Loachapoka attendance zone is further limited by several factors which reflect poorly upon the credibility of the figures on the map. The government introduced the map into evidence through the testimony of Lindberg Bernard Jackson, an Assistant Engineer in the Auburn City Engineering Office. Mr. Jackson prepared the map; however, he testified that he had not compiled the information about the number and race of property owners which appeared on it. That information was furnished to him by the city manager's office. Mr. Jackson testified that he did not know exactly how this information was compiled, who had compiled it, or whether or not it was accurate
 The government produced no witness who could testify, with personal knowledge, as to the accuracy or source of the figures on the map. This failure left unresolved several peculiarities in the figures. Although the figures on the map purport to indicate the number and race of the property owners in the annexed area, several of the annexed areas are marked with a zero, which would apparently indicate that no one owned the property involved. But since the annexations were undertaken only in response to petitions from property owners this zero figure is puzzling.
 In short, this map did not even purport to be evidence on the critical question of the school population in the annexed areas and was hardly convincing evidence on the facts it claimed to prove regarding the property owners. The trial judge understandably received this map into evidence with, in his own words, "a grain of salt."
 
 
 [17]
 The average number of white students enrolled at Loachapoka during these years was 29. An additional 59 white students would have increased the average number of whites to 88 students out of a total enrollment of 693 students
 
 
 [18]
 Feeney involved a claim that the Massachusetts statute which granted veterans a preference in employment in the state civil service unconstitutionally discriminated against women. Although the case involved gender, rather than racial, discrimination, nothing in the opinion suggests that the definition of discriminatory intent articulated in Feeney was limited to gender cases. Indeed the opinion relies heavily on Washington v. Davis and Village of Arlington Heights, both of which were racial discrimination cases, in clarifying the meaning of discriminatory intent
 The Supreme Court has indicated that Feeney's further explication of the intent requirement recognized in Washington v. Davis and Village of Arlington Heights is applicable to a school desegregation case. Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979).
 
 
 [19]
 The map introduced by the government indicates that several annexations involved areas which were owned either exclusively or predominantly by blacks. Two of the annexations approved during 1972 involved areas having a total of 161 black property owners and no white property owners. One of the other annexations in that year affected an area having 69 black property owners and 10 white property owners
 The proposed annexations were submitted to the Civil Rights Division of the Justice Department pursuant to the requirements of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1976) and were approved.
 
 
 [20]
 See e. g., Stout v. Jefferson County Board of Education, supra. In Stout, three predominantly one-race schools, two black and one white, were allowed to remain in a district which had formerly operated a dual school system. The district court refused to pair these schools because bussing students between them involved a hazardous trip across a mountain
 
 
 [21]
 The government's motion had originally requested that the Alabama State Board of Education also be ordered to participate in the development of an interdistrict desegregation plan for the Loachapoka school. Since we affirm the district court's order denying such interdistrict relief, the obligations of the State Board of Education with respect to the desegregation of schools in Lee County continue to be defined by Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967)
 
 
 [1]
 In the government's brief filed in the district court, I find the following language: "(u)nder Swann, supra, Wright, supra and Scotland Neck, supra, the fact that the Lee County, Auburn City and Opelika City school districts were operated as if they constituted one school district for purposes of student assignment indicates that this court is empowered to treat these three districts today as one school system for the purpose of (1) establishing the existence of a violation in the Loachapoka-Auburn-Opelika area and (2) developing and implementing an effective desegregation plan for the Loachapoka School." (citations omitted)