UNITED STATES of America,
Plaintiffs,

and

Laurel–Jones County Branch of the
NAACP, et al., Plaintiff–Intervenors,

v.

STATE OF MISSISSIPPI, et al. (Laurel
Municipal Separate School District, et
al.), Defendants.

CITY OF LAUREL,
MISSISSIPPI, Plaintiffs,

v.

CITY OF LAUREL SCHOOL BOARD
OF EDUCATION, et al., Defendants,

and

Laurel Jones County Branch of the
NAACP, et al.,
Defendant–Intervenors.

Civ. A. Nos. 4706, H87–0245(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

July 27, 1989.

Michael Adelman, Alison Steiner, Hattiesburg, Miss., for Laurel–Jones County Branch of NAACP, et al.

Salliann S.M. Daugherty and Diane S. Cohen, Sr. Trial Atty., Educational Opportunities Litigation Sec., Civil Rights Div., Dept. of Justice, Washington, D.C.

Charles Victor McTeer, amicus curiae, Greenville, Miss., for Miss. Educ. Ass'n.

Moran M. Pope III, Hattiesburg, Miss., for the AEA.

Sarah E. Deloach, Asst. Atty. Gen., Jackson, Miss.

Terry L. Caves, Laurel, Miss., for Jones County, Laurel City School.

Richard L. Yoder, Laurel, Miss., for Laurel Municipal Sep. School Dist.

Perry Sansing, Brunini, Grantham, Jackson, Miss., for Jones School Dist.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Historically, the Jones County School District and the Laurel Municipal Separate School District (hereinafter Laurel School District) have been maintained as separate public school districts within Jones County, Mississippi. Since 1970, the Laurel School District and the Jones County School District have operated under separate desegregation plans. The Laurel School District has been governed by a court-imposed plan which was adopted in 1970 following the commencement by the United States of Civil Action No. 4706 against the State of Mississippi alleging that certain school districts in the state, including the Laurel School District, had failed to eliminate the dual system of public schools. Initially, the Laurel order adopted a desegregation plan only for the junior and senior high school levels in the Laurel School District. Subsequently, in May 1978, a court-ordered desegregation plan for the elementary schools of the Laurel School District was adopted by this court. Although the Jones County School District was not a defendant in Civil Action No. 4706, that district in 1970 adopted a voluntary desegregation plan pursuant to a determination by the United States Department of Health, Education and Welfare (HEW), now the United States Department of Education, that the Jones County schools were not in compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Both the Laurel desegregation order and Jones County's desegregation plan include identical *Singleton*[1] interdistrict transfer provisions, as follows:

> If the school district grants transfers to students living in the district for their attendance at public schools outside the district, or if it permits transfers into the district of students who live outside the district, it will continue to do so on a non-discriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual school system.

In December of 1987, the City of Laurel filed a petition for annexation in the Jones County Chancery Court alleging, *inter alia*, that the Jones County School District and the Laurel School District had permitted and encouraged illegal guardianships for school purposes which negatively impacted desegregation in both districts. The city requested that the court adjudicate a constitutional system of public education for all the children of Laurel and Jones County, Mississippi. The case was removed to federal court as Civil Action No. H87–0245(R) upon petition of the Laurel

---

1. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir.), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 530 (1970), is the case in which this provision restricting transfers was first utilized in a desegregation order.

School District in response to which the Jones County Board of Education moved to remand the action to state court.

On August 25, 1988, the United States Magistrate entered an order denying the motion to remand. That order went further, however, and dissolved the Laurel School District and "merged" or consolidated the Laurel district with the Jones County School District. Though none of the parties to that litigation appealed the magistrate's order,[2] on September 1, 1988, the Laurel–Jones County Branch of the National Association for the Advancement of Colored People (NAACP) filed a motion to intervene in the action, seeking to set aside, alter or amend the magistrate's order. Additionally, the United States filed a motion for a status conference before this court to determine the propriety of the magistrate's order; the government expressed concern that the magistrate had, in disregard of Civil Action No. 4706, dissolved the Laurel School District in a separate action in which neither the United States nor the State of Mississippi were made parties.

Following a February 10, 1989 status conference before this court,[3] an agreed order was entered consolidating Civil Action No. H87–0245(R) under the state-wide desegregation case, Civil Action No. 4706; the Jones County School District, both in its former capacity and as the consolidated school district, was joined as a party defendant in Civil Action No. 4706, and the Laurel–Jones County Branch of the NAACP was permitted to intervene as a party plaintiff. Shortly thereafter, this court granted permissive intervention to the Association for Excellence In Education (AEE), a Laurel–Jones County nonprofit organization of parents, community and business leaders whose purpose is to promote quality education in Jones County.

Although the court had, after the February status conference, established a schedule for the parties' submission of proposed desegregation plans for the consolidated school district, the court subsequently determined, following a conference with the parties, that the magistrate's order contained insufficient findings upon which to base court-ordered school district consolidation. The court thereafter conducted a liability hearing for the purpose of determining whether there exists a factual and legal basis for the court to order consolidation of the two public school districts in Jones County, the Laurel School District and the Jones County School District.

### THE CONTROVERSY

At the time of its 1970 desegregation order, the Laurel School District had a student enrollment of 6073 of which 2833 or 46% were black and 3270 or 54% were white. At the time of the Jones County School District's HEW consent agreement, with an enrollment of 8279, the student ratio in the county district was 79% white and 21% black. While student enrollment and the student ratio in the Jones County School District have remained relatively stable over the years and as of the 1988–89 school year was 8478, 81% white and 19% black,[4] student enrollment in the Laurel School District has decreased dramatically, from 6073 to 3215, and the percentage ratio differential of whites to blacks in the Lau-

---

**2.** The court would simply note that the magistrate's order was entered with the understanding among the parties—the two school boards and the City of Laurel—that while they would not sign a consent decree, they would not appeal the order of consolidation.

**3.** Present at the status conference were counsel for the United States, the State of Mississippi, the former Laurel School District, the former and consolidated Jones County School District, the City of Laurel, the Laurel–Jones County Branch of the NAACP and the Mississippi Association of Educators (MAE).

**4.** The relative constancy of the total student enrollment as well as the ratio of black/white enrollment in the county district is demonstrated by a breakdown of enrollment by race from the school year 1978–79 through 1988–89:

| Year | Black | % | White | % | Total |
|------|-------|----|-------|----|-------|
| 1978–79 | 1376 | 18 | 6303 | 82 | 7679 |
| 1979–80 | 1335 | 17 | 6318 | 83 | 7653 |
| 1980–81 | 1309 | 18 | 6163 | 82 | 7472 |
| 1981–82 | 1269 | 17 | 5994 | 93 | 7263 |
| 1982–83 | 1392 | 18 | 6168 | 82 | 7560 |
| 1985–86 | 1396 | 19 | 6028 | 81 | 7424 |
| 1986–87 | 1543 | 19 | 6536 | 81 | 8079 |
| 1987–88 | 1620 | 19 | 6887 | 81 | 8507 |
| 1988–89 | 1641 | 19 | 6837 | 81 | 8478 |

rel schools has steadily widened; as of the 1988–89 school year, 75% of the students enrolled were black and 25% were white.[5] These figures demonstrate that while the Jones County School District has been racially identifiable as a white district since the time a desegregation plan was adopted in 1970, the Laurel School District has, over time, become increasingly black and is now clearly perceived as a black school district. The question for the court's consideration at this stage is whether the decrease in white enrollment in the city system is attributable to any unconstitutional governmental action and, if so, to what extent such action has impacted desegregation or contributed to segregation between the districts and, based on that determination, whether an interdistrict remedy is appropriate.

Several of the parties to this action, and in particular the City of Laurel, the AEE, the Mississippi Association of Educators (MAE),[6] and the United States, have expressed their unqualified support for consolidation of the two school districts.[7] In support of their contention that consolidation is an appropriate remedy, these parties assert that the school districts have in the past and continue in the present to permit, explicitly or implicitly, interdistrict transfers which adversely affect desegregation and contribute to the racial identifiability of schools in both districts. They assert that the continuing decline in white student enrollment in the city schools has resulted from the fact that white students residing in the city attended and continue to attend the county schools, predominantly through the improper use of school guardianships, though also by using false county address-

es or by simply enrolling in the county schools. They argue that the districts have evidenced a tacit approval of such improper transfers through their failure to monitor and police transfers into and out of the districts and have perhaps even encouraged improper interdistrict transfers. Conversely, those who oppose consolidation, the Jones County School District and the NAACP, urge that while the districts may have violated their *Singleton* transfer provisions, the cumulative effect on desegregation has been de minimus and therefore does not support the imposition by this court of an interdistrict remedy; these parties urge that a remedy less intrusive than consolidation is appropriate for any violation which the court may find.

### THE REQUISITE SHOWING

Federal remedial power in school desegregation cases may be exercised only on the basis of a constitutional violation; the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Because the remedy requested in this case, consolidation, requires crossing district lines, this court's analysis of the propriety of that remedy is dictated by *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In *Milliken*, the Supreme Court explained that

> [b]efore the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitution-

5. This is demonstrated by the following:

| Year | Black | % | White | % | Total |
|------|-------|-----|-------|-----|-------|
| 1981–82 | 2012 | 62 | 1237 | 38 | 3249 |
| 1982–83 | 1946 | 63 | 1165 | 37 | 3111 |
| 1983–84 | 1982 | 64 | 1135 | 36 | 3117 |
| 1984–85 | 2024 | 67 | 1008 | 33 | 3023 |
| 1985–86 | 2112 | 70 | 909 | 30 | 3021 |
| 1986–87 | 2326 | 72 | 914 | 28 | 3240 |
| 1987–88 | 2348 | 74 | 804 | 26 | 3152 |
| 1988–89 | 2421 | 75 | 794 | 25 | 3215 |

6. To date, the court has declined to permit formal intervention in this action by the MAE for the reason that the need for protection of the

interests advanced by the organization, i.e., the preservation upon consolidation of teachers' positions, salaries, benefits, etc., would arise and be cognizable, if at all, only if consolidation was deemed necessary. Hence, intervention at this early state was considered premature. The MAE has, though, been allowed limited participation in these proceedings.

7. The former Laurel School District, though technically now nonexistent, advanced the position through its former counsel that it, too, favors consolidation.

al violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent school district.... In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.

*Milliken*, 418 U.S. at 744–45, 94 S.Ct. at 3127–28, 41 S.Ct. at 3115–16. In *Lee v. Lee County Board of Education*, 639 F.2d 1243 (5th Cir.1981), the Fifth Circuit explained that

[a] finding that a school district has accepted transfer students in violation of a *Singleton* clause customarily supports injunctive relief forcing an end to such transfers and compliance with the terms of the desegregation order. A finding that a district has violated a *Singleton* transfer provision included in its desegregation order does not, in and of itself, support a broader, interdistrict remedial order unless the conduct which violated the *Singleton* clause also comprised an

interdistrict constitutional violation when evaluated under *Milliken.*

*Lee County*, 639 F.2d at 1261. Thus, as a predicate to the imposition of an interdistrict remedy on local school districts, there must be clear proof of unconstitutional governmental action that has been a substantial and direct cause of a significant interdistrict segregative effect, together with a careful delineation of the extent of the effect. *Lee*, 639 F.2d at 1256. "In the absence of such a showing, school district lines are to be carefully observed...." *Id.* Finally, following *Milliken*, the court must remain cognizant that "the mere fact of different racial compositions in contiguous [school] districts does not itself imply or constitute a violation of the Equal Protection Clause in the absence of a showing that such disparity was imposed, fostered or encouraged by the State or its political subdivisions." *Milliken*, 418 U.S. at 756, 94 S.Ct. at 3133.[8] With these principles in mind, the court now proceeds to consider and evaluate the evidence presented at the hearing in this cause.

### THE PROOF

According to David Sheppard, Laurel's Superintendent of Education from 1977 until the August 1988 consolidation order, beginning in 1978, following the court-ordered desegregation of Laurel's elementary schools, although the Laurel School Board did not formally authorize any transfers out of the district,[9] white students began to leave the Laurel schools to attend

---

8. In *Milliken,* the court made it clear that the mere existence of a one-race school district does not violate the constitution. *See Milliken* 418 U.S. at 756, 94 S.Ct. at 3133; *see also Lee County,* 639 F.2d at 1254. In cases of alleged intradistrict constitutional violations, there exists a presumption that significant racial imbalance in the schools within an autonomous school district is a result of impermissible constitutional violations. This presumption aids the party seeking to secure federal remedial relief. *Milliken,* however, "refused to sanction the presumption that significant disparities in the racial composition of autonomous school districts resulted from impermissible actions by those districts and thus justified imposing upon them an interdistrict remedy." *Lee County,* 639 F.2d at 1255. Hence, this court is to evaluate the propriety of an interdistrict remedy "by the standards of substantial direct cause and signifi-

cant interdistrict segregative effect enunciated in *Milliken* and not by the use of the presumptions applied in intradistrict cases." *Id.* at 1257.

9. Section 37–15–29, Miss.Code of 1972, provides:
No minor child may enroll in or attend any school except in the district of his residence, unless such child be lawfully transferred from the school district of his residence to a school in another district in accord with the statutes of the state....
Miss.Code Ann. § 37–15–31 (Supp.1988) prescribes the procedure for the transfer of students from one school district to another, by petition of parent or guardian or upon the initiative of the board of trustees of the school district wherein the parents reside; the matter is then acted upon by both the transferor board and the transferee board.

the schools in Jones County. In some cases, the students family actually moved from the city. Many students, however, were thought to have been enrolled in county schools while still residing in the city.

Complaints concerning the alleged practice of students illegally attending Jones County schools were conveyed to Carey W. Clay, Superintendent of the Jones County School District, in a September 1979 letter from the Community Relations Service of the United States Department of Justice. Citizens of Laurel were contending that many white students, despite having provided the county district with proof of guardianship, were not legally residing in the county district. Clay was advised that "students having guardianship status not staying full-time, eating and sleeping, at the designated residence, may be violating the law." The letter also advised that if the allegations were true, the Laurel School District would be impacted by its "black-white ratio resulting in a predominantly black enrollment." Clay responded by advising principals "to check closely to be sure that all students live[d] within the correct school district."

Awareness of the problem of out-of-district transfers became particularly acute during the years 1981 and 1982. Allegations concerning impermissible transfers were again specifically brought to Clay's attention in June 1981. The Office of Civil Rights of the United States informed Clay by letter dated June 16, 1981 that a complaint had been received alleging that the school district engaged in discriminatory conduct in violation of Title VI of the Civil Rights Act of 1964 and in particular, that the district had discriminated against black students "by allowing illegal student transfers from the Laurel City School District into the Jones County School District." While the investigation which ensued resulted in a finding by the Office of Civil Rights that the district was, at least at that time, not in violation of Title VI, the county district did provide assurances, "to preclude future compliance problems," that "all students under guardianships will be required to submit evidence to the district

that they do, in fact, reside with their guardians." The only affirmative effort undertaken by the district, however, was to advise attorneys in Jones County to notify their clients for whom they instituted guardianships that "students attending the Jones County schools must reside in the Jones County School District."

Assistant Superintendent of the Laurel School District Thomas Goza, the individual primarily responsible for matters regarding student transfers, explained that Laurel had long been concerned over the loss of white student enrollment and suspected that there were white children under guardianships who did not actually reside in the county with their guardians but rather lived with their parents in the city and simply attended school in the county by virtue of guardianship papers. This concern prompted an "intensive investigation" by Goza during the 1981–82 school year of alleged illegal transfers from the city school district to the county schools; Goza's search revealed a total of 57 students who appeared to be attending school in Jones County while residing in Laurel. Nine of those students resided in the Pack District, an area of the county that had been annexed in 1949 for the purpose of school attendance only; the people in that district apparently had the mistaken belief that they had the option of having their children attend school in whichever district they chose. In addition to the Pack children, Goza discovered that 29 children, 5 of whom were black, whose parents resided in Laurel but taught in Jones County, were attending the county schools; teachers in the Jones County–Laurel area had traditionally been allowed to enroll their children in the district in which they taught.

Goza's findings relative to the Pack children and the children of teachers were made known to Jones County officials and after discussion, it was agreed that the Laurel School District would approve the transfer of those children for the remainder of the 1981–82 school year, following which the children would be returned to the city system. However, there were 19 other students suspected by Goza of living in the

city and attending county schools. In an effort to address the problem posed by those children, and to collectively "formulate and adopt a uniform policy to be used by both districts in determining eligibility of students to attend and/or to transfer in and out of these districts," the school districts sought an opinion from the attorney general for the State of Mississippi concerning student residence issues, and in particular, regarding the use of guardianships for school purposes. The attorney general responded that "where a guardianship over the person of a minor has been established by the Chancery Court, it is our opinion that the child is entitled to attend school in the district of the residence of the guardian, rather than in the district of the residence of the parent." The attorney general did not, however, provide an answer to the districts' inquiry as to whether "the appointment of a guardian establishe[s] residence regardless of where the child actually lives[.]" Rather, the attorney general responded that "only a court of competent jurisdiction could resolve the issues of fact and law involved."

Following receipt of the attorney general's opinion, the two boards, being unable to reach agreement, abandoned their efforts to adopt a joint transfer policy. The Laurel School District, though, based on the attorney general's opinion, understood that the use of school guardianships to effect interdistrict transfers was permissible, at least in cases where the child actually resided with the guardian. Accordingly, the Laurel School District adopted a school attendance policy which provided that a child was not to be permitted to enroll in or attend school in any school except in the school district of his residence. In the event the child had a guardian, the policy required that the child reside with his guardian to attend school under the guardianship, "residence" being defined by the policy as the place where such person "actually eats, sleeps and keeps his personal belongings every day of the week." In addition, the district implemented use of a "declaration of residence" form which parents were required to sign. However, following Goza's 1981–82 intensive investigation into the impermissible interdistrict transfers and following the receipt by the respective school boards of the attorney general's 1982 opinion, Laurel more or less abandoned any efforts to ferret out such transfers and instead, simply accepted the information provided on students' "declaration of residence" forms and determined to enforce its policy concerning illegal transfers simply by following up on complaints, i.e., specific names, it may have received from citizens in the community. The district's principals were responsible for enforcement of Laurel's policy, but they were not required to report—or even have any contact with—the district's central office regarding their efforts and/or findings. Indeed, Laurel determined that if a child was improperly attending school in the county, the Jones County District was responsible to investigate and discover the child and return the child to the city schools. According to Superintendent Sheppard, if a student was not in his district, it was not his responsibility. That is, Laurel did not consider it its duty to determine whether a child actually lived with his or her legal guardian in the county. And, while the question of transfers remained a concern to the Laurel district, it was not a "big concern."

At the same time, the Jones County District apparently did not consider itself responsible to affirmatively seek out students illegally attending school in its district. The Jones County Board merely continued to operate under an attendance policy it had adopted in 1970 that "no transfers would be accepted by the county from the city or any adjoining counties[,] ... that all children in the county system would attend County schools, and that in order for an out of state or out of county student to attend school in Jones County, this student would have to have a legal court appointed guardian." Jones County principals had been advised of the policy regarding interdistrict transfers and were charged with its enforcement. They were given the responsibility of assuring that "no students outside the district attend [their] school[s]." But, there were no uniform procedures for

verifying residence. If they had some question regarding a child's residence, they were to follow up by calling the student's parent or guardian, and if they discovered students attending their schools "who did not live in the district with parents or legal guardians, [they were] to inform them immediately that they [would] have to withdraw." Yet, even in cases where the district may have discovered such students (an isolated occurrence, indeed), it is not clear that the county district made any effort to remove that child from the county system.

Despite its assurances to the Office of Civil Rights in 1982, no system of monitoring for the purpose of verification of residence was ever established by the Jones district; in fact, the use of a legal residency form was not implemented in the county district until the 1988–89 school year and then, it was adopted only in response to "accusations" in the City of Laurel's annexation suit that the county and city school districts "had permitted and encouraged the illegal practice of school guardianships." However, the form adopted does not require verification, in the case of a guardianship, that the child resides with his or her guardian, and it is assumed by the district that the child does reside with the guardian.[10] In sum, the Jones County District has considered itself obliged only to follow up on specific complaints regarding illegal transfers.

All administrative personnel from both districts who testified at the hearing in this cause acknowledged that even after the 1981–82 furor over impermissible interdis-

trict transfers and the perceived loss of white student enrollment by Laurel to the county schools, there remained a general awareness that there was at least some incidence of improper out-of-district attendance, though the witnesses' perceptions as to the extent of the problem varied. Both school boards were undeniably aware of the occurrence of improper transfers between the districts. It was said to be commonly known in the community that students were obtaining guardianships to attend school out of district, especially white Laurel residents desirous of attending the predominately white Jones County Schools; this was a continuing topic of conversation in the Laurel area. Estimates as to the number of such guardianships ranged from "a few" to "hundreds" to "thousands."[11] Nevertheless, at no time did the Jones County School District or the Laurel School District conduct an analysis of the racial impact on the respective school districts of students who, whether by the use of guardianships or by other means, resided in Laurel and attended Jones County Schools, or vice versa. There was no examination or review to determine the race of the children enrolled in the county school system or the city schools under guardianships, and neither district employed attendance or investigative personnel to enforce the interdistrict transfer policies of the districts' respective desegregation orders. Moreover, school officials and staff, at least on occasion, instructed parents who wished to enroll their child in a particular school that they should obtain guardianships.[12] In

---

10. In addition to its implementing the use of the legal residency form, the Jones district responded to the charges in the suit by requesting that its principals make another search to determine if students were improperly attending the county schools. That search, it is said, turned up but a few students, though it is clear now there were many more.

11. In 1987, Morris Kinsey, State Education Chairman of the NAACP, had placed the number somewhere around 3000 and directed the Laurel–Jones County NAACP to file a complaint with the Laurel School District concerning the transfers. Plaintiff Wheeler, the Education Chairperson of the Laurel–Jones chapter, consistent with the local NAACP's resistance to con-

solidation, expressed the view that Kinsey's estimate was exaggerated; she testified that she did not believe the problem of guardianships was "overly extensive."

12. During his tenure as principal of West Jones High School but prior to becoming superintendent, Jay Mason and his wife, a counsellor at West Jones, instructed parents who wished to send their children to the county schools as to the necessity of obtaining a guardianship for that purpose and in fact, referred parents to the school board's attorney for more information concerning guardianships. Similarly, Thomas Goza, Assistant Superintendent of the Laurel School District, after receiving the attorney general's 1982 opinion, discovered a number of

sum, with the exception of a brief period of time in 1981–82, neither of the school districts involved in this litigation has made any genuine effort to determine the extent of interdistrict transfer activity and certainly has made no effort to determine the cumulative segregative effect, if any, on the respective school systems. Indeed, after the 1981–82 controversy between the districts concerning illegal transfers, and in particular school guardianships, the issue has remained virtually dormant in terms of affirmative efforts by either district to eradicate the problem.[13]

■ The Fifth Circuit has explicitly recognized that a *Singleton* transfer provision does not necessarily require that a school district stop accepting transfer students, though it may do so as a means of assuring full compliance with the requirements of the *Singleton* clause. But, where a school district does operate subject to a *Singleton* provision and does permit or, as here, is aware of transfers, it is required to identify the home school and home district of each transfer student, to verify that the student is in fact a resident of the transferee district, and to determine the effect of the transfer on the transfer student's home school and district as well as on its own schools. *Lee v. Eufaula City Board of Education*, 573 F.2d 229, 235 (5th Cir. 1978). In the case at bar, it is clear that neither school district made any concerted effort to determine the number of impermissible transfers or to analyze the cumulative effect of the transfers on its district or the district in which the students would have attended school if not for the transfers. Nor did the boards, or either of them, have a policy of verifying that stu-

dents were in fact residents of the district in which they sought to attend school. Under these circumstances, the districts' omissions are clearly violative of their obligations under the *Singleton* transfer provisions contained in their respective desegregation orders. However, as this court has previously noted, a finding that the districts have violated the *Singleton* transfer provisions included in the desegregation orders does not, in and of itself, support interdistrict remedial relief unless the conduct also comprised an interdistrict constitutional violation when evaluated under *Milliken*. Thus, the court must analyze the proof to determine whether the districts' failure to monitor and address impermissible transfers has been a "substantial cause" of a "significant" interdistrict segregative effect.

■ Attorney William Thames, at the request of the City of Laurel, examined all guardianship records of the Jones County Chancery Court, Second Judicial District, from January 1, 1977 through January 12, 1989. His testimony and the documentation compiled by him, establish that during those years, 701 guardianships were established, excluding contested guardianships, guardianships involving corporations and conservatorships for incompetent adults. Thames categorized those guardianships in accordance with the purpose for the guardianship as stated in the decrees appointing guardians; of the 701, 193 were for "business" reasons, 110 for specified "personal" reasons, 190 were established for "school" purposes,[14] 125 were decreed for the "best interest" of the child, and as for the remaining 83, classified as "none," no reason was specified. After deducting school

children residing in the Laurel School District with relatives other than their parents and specifically advised those children to obtain guardianships in order to attend school within the district. According to Goza's testimony, there were over a hundred such students so instructed in 1982 or 1983, most of whom were black.

**13.** In July 1987, the Laurel School Board received a request for information from the United States Department of Justice in response to an NAACP complaint regarding illegal guardian-

ships and the lack of black cheerleaders in the Laurel Schools, among other concerns. Interestingly, the city school board undertook to address the cheerleading concern but took no specific action concerning the impermissible guardianships.

**14.** For those guardianships categorized as "school" guardianships, the guardianship decree explicitly refers to school, either "to enroll in school" or "for school purposes."

guardianships that Thames considered "legitimate," [15] there remained a total of 374 guardianships in the "school," "best interest," and "none" categories which actually involved 470 children.

The supporters of consolidation reason that the large number of guardianships in the "school," "best interest" and "none" categories, coupled with the fact that at or near the start of each school year, i.e., during the months of August, September and October, there has been an "explosion" of guardianships in these categories, leads to the inference that there has been extensive and pervasive utilization of guardianships by white students to effectuate improper, racially motivated, transfers from the predominately black city school system to the predominately white county district. However, the guardianship decrees do not indicate and there has otherwise been no proof as to how many of the guardianships were for blacks or whites, which guardianships were actually used, how many were by city residents sending children to the county, how many were for intradistrict transfers within the city and county schools, or whether the ward actually resided with his guardian.[16] As the consolidation opponents have correctly observed, this failure of proof begs the court to apply layers of assumptions which are unsupported by evidence. This the court cannot do. Under the circumstances, while it can certainly be inferred that the great majority of these guardianships were established for the purpose of school attendance, the court cannot simply assume that the guardianships were primarily for white children residing in Laurel but wishing to attend school in the county.[17]

Of course, the mere fact that not all of the guardianships were specifically identified as being for white children transferring from Laurel to Jones County or black children transferring from Jones County to Laurel does not detract from the fact that there has been a pattern of substantial use of chancery court guardianships by children to attend a school district other than the one which they would have attended but for the guardianship orders. However,

**15.** A guardianship was deemed "legitimate" by Thames if the decree established on its face that the guardianship was necessary for the ward to attend school in either Laurel or Jones County, as, for example, where the parents lived overseas or in another state.

**16.** Each of the parties in this case has apparently assumed that so long as the child that was the subject of a guardianship actually resided with his guardian, the district was not in a position to challenge the propriety of the child's enrollment in its district. In the court's view, though, even though it is apparent that many of the guardianships established for school purposes involved a situation in which the ward did not actually live with the guardian, if the guardianships were instituted for the purpose of allowing white students to transfer from the Laurel School District to the Jones County School District, or black students to transfer from the Jones County schools to the Laurel schools, regardless of whether the child lived with the guardian, if districts knew of yet failed to take action against the practice, that could amount to a violation of the desegregation orders under which the districts operated if the granting of those guardianships had a substantial cumulative effect on desegregation in the districts. In this vein, the court would note that the Mississippi legislature has enacted legislation which became effective July 1, 1989 which prohibits recognition of any guardianship for school purposes. Miss.Code Ann. § 37–15–31(d) now provides as follows: "Any legal guardianship formed for the purpose of establishing residency for school district attendance purposes shall not be recognized by the affected school board."

**17.** Indeed, of the approximately 165 "school" guardianships, 45 do specify the school and/or the school district which the ward is to attend, i.e., "Jones County" or "Laurel." Interestingly, of these, slightly over one-half specify that the ward is to attend school in Laurel. If anything, the most reasonable inference which can be drawn from this is that there was an incidence of intradistrict movement between Laurel city schools as well as attendance in the Laurel schools by children whose parents lived out of district. This inference is further supported by the testimony of Goza that after receiving the attorney general's opinion in 1982, Laurel city school officials advised children living out of district that in order to attend school in the city, they would have to obtain a guardianship and reside with the guardian. According to Goza, since 1982, he had occasion to advise well over 100 persons as to the necessity of a guardianship for the for the attendance of school in the city, primarily in the 1982–83 year. And, perhaps coincidentally, perhaps not, the greatest number of guardianships in the "best interest," "school" and "none" categories appears in 1982.

the proof regarding the guardianships does not identify the proposed transferor and transferee districts or the race of the ward and as such, does not relate the number of guardianships, undeniably a large number, to an interdistrict constitutional violation. Thus it is not "clear proof of cause and effect and a careful delineation of the extent of the effect." *See Lee County,* 639 F.2d at 1256.

In addition to the evidence presented at trial relative to the guardianship records themselves, several parents, teachers and others testified at trial as to white students who were residing in the Laurel School District but attending schools in Jones County. Some had guardianships; some did not. Some were correlated to specific school years in which they attended the Jones County schools and some were not. In all, there was proof of approximately 80 students,[18] excluding those involved in the 1981–82 controversy concerning Pack district children and children of teachers.[19] Even were the court to assume that each of these children attended school in Jones County in each of the school years from 1981 to 1989, the percentage increase in white student enrollment in the city schools, had they been returned to the Laurel system, would at no time have exceeded four percent:

| Year | Actual Percentages | | Percentages assuming return of children | |
|---|---|---|---|---|
| | Black | White | Black | White |
| 1981–82 | 62% | 38% | 59% | 41% |
| 1982–83 | 63% | 37% | 60% | 40% |
| 1983–84 | 64% | 36% | 61% | 39% |
| 1984–85 | 67% | 33% | 63% | 37% |
| 1985–86 | 70% | 30% | 67% | 33% |
| 1986–87 | 72% | 28% | 69% | 31% |
| 1987–88 | 74% | 26% | 71% | 29% |
| 1988–89 | 75% | 25% | 72% | 28% |

In *Lee v. Lee County Board of Education,* the Fifth Circuit found that a 5.24% increment of change which would have made a school 91% rather than 96% black, seemed "unlikely to alter significantly general perceptions of a school's racial identity or the behavior of persons who rely on such factors in determining whether or not to send their children to a particular school." *Lee County,* 639 F.2d at 1261. Similarly, in *Lee v. Eufaula City Board of Education,* a 4.24% increase was indicated by the Fifth Circuit to be an insufficient change in racial composition to justify an interdistrict remedy. *Eufaula City,* 573 F.2d at 232. And, while a strictly quantitative approach to measuring the effect of student transfers on desegregation is to be avoided, the court is of the opinion that a 4% increase under the facts of this case is likewise insufficient. The Laurel School District, irrespective of the absence of those 80 children from its rolls, would be perceived as a black school district. Returning those children to the city schools

18. These students are identified in the appendix according to the years attended, if proven, the school attended, if proven, and the method by which that child attended the county schools, if proven.

19. Interdistrict segregative practices and/or policies on which an interdistrict remedy is sought to be based must have current and continuing, substantial and direct segregative effect before an interdistrict relief may be properly ordered in the case of separate, autonomous school districts; past actions and/or inactions which may arguably have been the result of segregative intent, but of which there are no lingering substantial and significant interdistrict effects, are of no relevance in shaping a multidistrict remedy. *Bronson v. Board of Education of City School District of City of Cincinnati,* 578 F.Supp. 1091 (S.D.Ohio 1984), *aff'd,* 525 F.2d 344 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976); *see also Jenkins by Agyei v. State of Missouri,* 807 F.2d 657 (8th Cir.1986), *cert. denied sub nom.,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987) (in addition to clear proof of interdistrict violation and interdistrict effect, it must be shown that interdistrict effects are current before interdistrict remedy may be invoked in a school segregation case). In the court's view, the interdistrict problem of 1981–82, at least as pertains to the Pack district children and children of teachers, are not relevant to assess the current segregative effect since the proof relative to those children was that there was an agreement that they would be returned to the city schools and there was no proof that this did not occur. In any event, it is highly likely that the children involved have now, through the natural course of events, i.e., graduation, moved out of the school systems entirely.

would not alter that perception significantly.

Of course, the court is not bound by the precise numbers actually proven in reaching its decision in this regard. The record demonstrates unequivocally that students were engaging in illegal transfers through the use of guardianships, false addresses and simply attending school out of district. And, the court does believe that there are now and have been more white children in the county schools who belong in the city schools than were shown by actual proof, just as it seems there are black children enrolled in city schools who properly belong in the county schools. It has been and continues to be an ongoing problem between the districts and unfortunately, neither district has sought information concerning the numbers involved nor have they kept records of those students of which they were actually aware. Thus, while not condonable, the lack of greater proof is explainable. Nevertheless, the court cannot assume that the number of white children wrongfully in the Jones District so far exceeded that actually proven so as to have caused a significant cumulative effect on desegregation.[20]

In May 1978 when the court ordered desegregation of Laurel's elementary schools, it was projected that for the 1978–79 school year, the Laurel total enrollment would be 3768, 52% black and 48% white. As it developed, the district enrollment in that year was 56% black. The same year, the Jones County School District was predominately white with an 18% black enrollment. Over the ensuing years, the black ratio in the city district increased; in 1987–88, the district was approximately 74% black and 26% white and for the 1988–89 school year, was approximately 75% black and 25% white. The Jones County ratios, and its total enrollment in 1988–89, were substantially the same, 81% white and 19% black, as in 1978–79. From the 1978–79 school year through 1988–89, the white enrollment in the Jones County School District increased by 534 students, whereas the white enrollment in the Laurel School District decreased by 814 students. Despite these figures, however, the proof demonstrates that in the years 1985 through 1988, more black students actually transferred out of the Laurel School District than did white students:

| 1985–86 | | 1986–87 | | 1987–88 | |
|---|---|---|---|---|---|
| White | Black | White | Black | White | Black |
| 167 | 186 | 146 | 211 | 188 | 238 |

Further, at least during 1986 through 1988, more white students transferred into the Laurel School District than transferred out:

| 1985–86 | | 1986–87 | | 1987–88 | |
|---|---|---|---|---|---|
| In | Out | In | Out | In | Out |
| 166 | 167 | 181 | 146 | 200 | 188 |

Also during those years, more black students transferred into the district than white students,

| 1985–86 | | 1986–87 | | 1987–88 | |
|---|---|---|---|---|---|
| White | Black | White | Black | White | Black |
| 166 | 228 | 181 | 211 | 200 | 279, |

and more black students transferred into the district than transferred out.

| 1985–86 | | 1986–87 | | 1987–88 | |
|---|---|---|---|---|---|
| In | Out | In | Out | In | Out |
| 228 | 186 | 211 | 211 | 279 | 238 |

For these same school years, the number of student files, by race, sent from Laurel to Jones County were as follows:

| 1985–86 | | 1986–87 | | 1987–88 | |
|---|---|---|---|---|---|
| White | Black | White | Black | White | Black |
| 78 | 45 | 65 | 46 | 93 | 61 |

In 1985–86, the white enrollment of the Jones County School District was 6028, 81% of the student enrollment. The 78 white students transferring from Laurel constituted 1.29% of the white students attending Jones County schools in 1985–86. In 1986–87, the white student enrollment of the Jones County School District was 6536 students, 81% of the total student enrollment. The 75 white students transferring from Laurel constituted 1% of the white students attending Jones County schools in 1986–87. In 1987–88, the white student enrollment of the Jones County School District was 6887 students, 81% of the total student enrollment. The 93 white students transferring from Laurel constituted 1.35%

---

20. The court notes that in evaluating the evidence, because of the lack of proof, there was no consideration of black children from Jones County who were improperly enrolled in the city schools. The evidence did indicate there were such children which would have resulted in a greater percentage of whites in relation to the Laurel School District's total enrollment.

of the white students attending Jones County schools in 1987–88.

Of the 568 students transferring into Jones County during the 1985–86 school year, 465 (80%) were white. However, only 78 (17%) of the white transfer students were transferees from the Laurel city system. If those 78 white students were returned to the city school system, the total white population in the city schools that year would have increased from 909 of 3021 to 980 of 3099. This addition would represent a 2% increase (from 30 to 32%) in the white student population in Laurel. Similarly, in 1986–87, of the 766 children transferring into the Jones County system, 602(79%) were white. However, only 65 (11%) of the white transfers came from the Laurel School District. These transfers from Laurel decreased the total white population in the Laurel system from 979 of 3305 or 30% to 914 of 3240 or 28%. Finally, in 1987–88, 647 (82%) of the 782 transfers into Jones County were white children, 93 (14%) of whom were from the Laurel city schools. The 93 transfers from Laurel reduced the number of white students from 897 of 3245 (28%) to 804 out of 3152 (26%).

Certainly, over the years, were this pattern to continue, there would be a significant cumulative effect. However, there is no proof whatsoever as to what percentage of these transfers were legitimate, brought about the child actually moving to the county, as opposed to impermissible, as through the use of guardianships or the giving of false addresses. The record here, perhaps unfortunately, does not support a *Milliken* finding of significant racial isolation between the Laurel and Jones County School Districts occasioned by segregative actions or inactions of the boards particularly where there are other credible, racially neutral explanations for the decline in white enrollment in the city system. At trial, there was testimony from Robert Gaddis, the president of the Laurel branch

of the Trustmark National Bank and former Laurel School Board member, as well as David Sheppard, that in the late 1970's and early 1980's, there was an "exodus of people" from Laurel because of the oil and gas business slowdown. Gaddis testified that the work slowdown affected whites more harshly, accounting for the greater white population movement. Further, with the development of new residential subdivisions, many people, particularly whites, moved to the county. Additionally, in 1983 or 1984, a third private elementary school opened in Laurel. United States census data demonstrates that the City of Laurel declined in population from 24,145 in 1970 to 21,897 in 1980. Laurel new residence construction data reveals a decline from a high of $3.026 million in 1978 to $210,925 in 1988. The county population during the same time period, i.e., from 1970 to 1980, increased from 56,357 to 61,912. Thus, economic forces which were obviously causing shifts in the city and county populations as well as other nonracial factors present a plausible, if not probable, explanation for the decline in white enrollment. Unauthorized interdistrict transfers as alleged by the proponents of consolidation certainly have played a role—but on the record presently before the court, the court cannot assume that they played a significant part.

CONCLUSION

As previously explained, part of the finding essential to a determination of liability by this court such as would justify an interdistrict remedy concerns not just the extent to which interdistrict student transfers to or from the defendant school districts violate the *Singleton* transfer provisions of their remedial desegregation orders, but whether such transfers have a significant cumulative effect so as to satisfy the *Milliken* standard.[21] The court is not satisfied that the record in this case

21. In *Lee v. Eufaula City Board of Education,* 573 F.2d at 233, the Fifth Circuit held that the cumulative segregative effect of interdistrict transfers is to be measured on a school-by-school basis. Here, however, the evidence did not relate transfers to particular schools but

rather from district to district. Moreover, the transfers, to the extent proven, affected the districts as a whole and not necessarily particular schools. Accordingly, under the circumstances, a more detailed school-by-school analysis was neither possible nor necessary.

justifies finding that the interdistrict transfers warrant consolidation under *Milliken.* Ironically, the sparsity of proof in the record relative to the full extent of interdistrict transfers is due, at least in part, to the failure of Laurel and Jones County school officials to effectively investigate the transfer problem and to maintain adequate records of transfers. The lack of that information naturally would have prevented both districts from determining, in compliance with their *Singleton* transfer provisions, whether the cumulative effect of transfers would reduce desegregation in either district. Unfortunately, that lack of information also impedes a finding by this court as to the extent of the transfers and the real effect on desegregation in the districts.

The Fifth Circuit has directed that courts must measure the cumulative effect of student transfers "from a qualitative viewpoint, without blind deference to an objective mathematical formula." *Eufaula City*, 573 F.2d at 232. Thus, this court's analysis was required to take into account whether the transfers have caused or significantly contributed to a real or perceived racial identifiability of either or both of the school districts. Here, while racial identifiability of the two districts is undeniable—it is both real and perceived—and while the court recognizes that white enrollment has decreased and black enrollment increased in the Laurel School District over the past ten years, there simply is not clear proof that interdistrict transfers were the cause or a significant factor in causing that result, especially when there do exist other potential explanations, including demographic changes. And, while the court does hold the subjective opinion that there does exist a greater incidence of improper interdistrict transfers, racially motivated transfers, than were actually proven, there is simply no objective proof which would support overriding these otherwise autonomous district lines.[22]

█ The court would observe that in its view, consolidation would, over the long term, be beneficial to both school districts from an educational, financial and desegregative standpoint.[23] A primary educational benefit of consolidation would be the ability of a consolidated district to offer a broader curriculum, including more advanced placement courses, R.O.T.C., vocational technical centers, foreign languages and generally opportunities for a greater variety of courses that cannot be offered by two separate systems. While the educational advantages of consolidation would perhaps most immediately impact the county students, the Laurel students could benefit educationally as well since there are presently courses available in Jones County schools that are not available in Laurel schools. Thus, a consolidated school district could better serve the students by providing a stronger curriculum. Moreover, to the extent that evidence was presented concerning the relative merits of consolidation versus separate school districts, the proof tended to show that consol-

**22.** The court would note that Laurel's loss of student enrollment—to the county schools and elsewhere—has apparently not adversely affected the ability of the Laurel schools to provide faculty, facilities and curriculum to support a quality education for its students. In fact, Laurel teachers' salaries and benefits are higher than those in the Jones County district; Laurel's expenditure per pupil has been and remains substantially higher than in the Jones district; Laurel offers advanced placement courses whereas Jones County does not, and, Laurel facilities are superior to those of Jones County, several of which are in need of substantial renovation or replacement. Overall, the proof tended to show that the Laurel School District—predominantly because it has a broader tax base and hence greater financial support—has more to offer its students from a resource/educational standpoint than does the county district.

**23.** The NAACP was granted intervention by agreement of the parties. It has become manifest from the testimony of NAACP witnesses, however, that their interest in this case is not in school desegregation. In fact, these witnesses advocated maintaining the separateness of the city school district largely for the very reason that the city schools are by far predominately black and they desire to keep them so. This position flies in the face of the goal of desegregation. Moreover, the court would note that the decision of the Laurel School Board to dissolve and merge the district with the Jones County School District appears to have been motivated primarily by economic and social as opposed to racial concerns.

idation would create a more efficient system, both administratively and economically. It appears that since 1982, Laurel's tax base has declined and is eroding each year. Consolidation could potentially benefit the city by broadening the tax base. Moreover, under the state's new equity funding bill and grant program, incentive is provided to consolidate since counties with one school district per county will receive additional state funding per child. *See* 1989 Miss.Laws, Ch. 510 (effective July 1, 1990). Nevertheless, federal courts cannot require consolidation as a method of achieving desegregation, even though cost effective and efficient, unless it is essential to correct a constitutional violation. *Little Rock School District v. Pulaski County Special School District No. 1,* 778 F.2d 404 (8th Cir.1985), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986); *see also Taylor v. Ouachita Parish School Board,* 648 F.2d 959, 972 (5th Cir.1981). This echos the teaching of *Swann* that the remedy should be closely tailored to the nature and scope of the violation and should avoid, if possible, infringing on state or local government autonomy. *Liddell v. State of Missouri,* 731 F.2d 1294 (8th Cir.), *cert. denied sub nom.,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). In the absence of the necessary *Milliken* findings, this court may not override the autonomy of these two school districts.[24]

## APPENDIX

At trial, the following white students were specifically identified as having attended at various times over the past ten years the Jones County Schools while residing in the City of Laurel. Many of these students are no longer in the county schools.

| YEAR | NAME | SCHOOL | METHOD |
|---|---|---|---|
| 1986–88 | Dennis, Lydia | Northeast | |
| 1986–88 | Dennis, Cynthia | Powers | |
| 1986–88 | Dennis, Jay | Powers | |
| 1987–88 | Burroughs, Julie | Shady Grove | |
| 1987–89 | Burroughs, Jessica | Shady Grove | guardianship |
| 1987–88 | Burroughs, Joey | Shady Grove | |
| 1986–88 | Albritton, Chris | Shady Grove | |
| 1986–88 | Albritton, Kelly | Shady Grove | |
| 1986–87 | Dozier, Chad | Shady Grove | |
| 1987–88 | Windham, Chris | Shady Grove | |
| 1986–88 | Davis, Christopher | Shady Grove | guardianship |
| 1986–88 | Davis, Thomas | Shady Grove | guardianship |
| 1988–89 | Cooley, Stephanie | Shady Grove | guardianship |
| 1988–89 | Cooley, Emily | Shady Grove | |
| | Cooley, Jamey | Shady Grove | |
| 1985–89 | Hankins, Amanda | Shady Grove | false address |
| 1984–89 | Hankins, Alex | Shady Grove | false address |
| | Welch, Julie | Calhoun | guardianship |
| | Welch, Wyatt | Calhoun | |
| 1987–88 | Kennedy, Steven | Calhoun | |
| 1987–88 | Kennedy, Scott | Calhoun | |
| 1987–89 | Smith, Clay | Calhoun | guardianship |
| 1988–89 | Smith, Corey | Calhoun | guardianship |
| 1987–88 | Lowery, Amber | Calhoun | guardianship |
| 1987–88 | Lowery, Devan | Calhoun | guardianship |
| 1988–89 | Cornier, Nicole | Calhoun | guardianship |
| 1987–88 | Smith, Lee | Calhoun | |
| 1987–88 | Nowlin, Mollie | Calhoun/West Jones | |

**24.** In closing, the court notes that the issue of interdistrict transfers generally and school guardianships specifically has been a "very tough" issue for the State of Mississippi. The Mississippi Department of Education is aware of guardianships that are used for school transfers and is currently working in conjunction with the Department of Justice and Office of Civil Rights in exploring the development of an acceptable program to track and monitor interdistrict student transfers, though a full solution to the problem has yet to be discovered.

| YEAR | NAME | SCHOOL | METHOD |
|------|------|--------|--------|
|  | Howell, Luke | Calhoun |  |
| 1987–88 | Webb, Casey | Calhoun |  |
| 1987–88 | Webb, Kimberly | Calhoun |  |
|  | Kittrell, Vanessa | Calhoun |  |
| 1978–81 | Wade, Jeannie | Calhoun |  |
| 1977–89 | Wade, Alan | Calhoun |  |
| 1989 | Wade, David | Calhoun |  |
| 1980 | Windham, Jennifer | Calhoun |  |
| 1984 | Cockerham, Laura Leigh | Calhoun | guardianship |
| 1984 | Cockherham | Calhoun | guardianship |
| 1979–81 | Hollifield, | Calhoun | false address |
| 1979–81 | Hollifield | Calhoun | false address |
| 1977–89 | Bilbo, Melissa | Northeast | guardianship |
| 1987–89 | Bilbo, Wendy | Northeast | guardianship |
| 1987–88 | Noel, Lisa | Northeast | guardianship |
| 1986–89 | Henshaw, Hope | Ellisville | guardianship |
| 1986–89 | Henshaw, Corey | Ellisville | guardianship |
| 1984–85 | Hourin, Cindy | Ellisville |  |
| 1984–85 | Estein, Virginia | Ellisville |  |
| 1984–85 | Name unknown | Ellisville |  |
| 1984–85 | Name unknown | Ellisville |  |
| 1987–89 | Carter, Wesley | West Jones |  |
|  | Simpson, Jamie | West Jones |  |
|  | Clark, Charlie | West Jones |  |
|  | Matthews, Joey | West Jones |  |
| 1986–89 | Manning, Tessa | West Jones | guardianship |
| 1986–87 | Boleware, Ashley | West Jones |  |
| 1987–88 | Webb, Robbie | West Jones |  |
|  | Kittrell, Scooter | West Jones |  |
|  | Kittrell, Shannon | West Jones |  |
| 1987–88 | Wilson, Mickey | West Jones |  |
| 1987–88 | Trest, Missey | West Jones |  |
| 1986–87 | Stinson, Emily | West Jones | guardianship |
| 1986–87 | Allison, Angel | West Jones |  |
| 1986–87 | Poole, Darby | West Jones | guardianship |
|  | LaVigne, Jolie | West Jones |  |
| 1985–87 | LaVigne, Laura | West Jones | false address |
| 1980–82 | Thames, Lori | West Jones |  |
| 1984–87 | Kenny, X | West Jones | enrolled |
| 1983–86 | Drennan, Beth | West Jones | guardianship |
| 1978–80 | Goodwin, Allison |  |  |
| 1987–88 | Riles, X |  | enrolled |
| 1987–88 | Riles, X |  | enrolled |
| 1984–87 | Kenny, X | Calhoun | guardianship |
| 1983–87 | Shoemake, Mark |  | guardianship |
| 1979–82 | Tillery, Ellen |  | guardianship |
| 1983 | Wiginton, Matthew |  | guardianship |
| 1987–88 | Ellzey, Billy Kyle |  | guardianship |
|  | Ford, Holly |  |  |
|  | Jones, Bill |  |  |